Case: 20-1750    Document: 17    Filed: 09/21/2020    Pages: 90

No. 20-1750

---

# UNITED STATES COURT OF APPEAL
# FOR THE SEVENTH CIRCUIT

---

Jacqueline Watkins,
Plaintiff-Appellant,

v.

City of Chicago,
Defendant-Appellee,

---

**Appeal From The United States District Court
For the Northern District of Illinois
Case No. 17-cv-02028
The Honorable Judge Edmond E. Chang**

---

**BRIEF AND REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT, JACQUELINE WATKINS**

---

JACQUELINE WATKINS
Pro se
Plaintiff-Appellant

1727 W, 107th Street
Chicago, IL 60643
(773) 562-0167

# APPELLANT BRIEF

## Table of Contents

<u>Page</u>

Table of Contents……………………………………………………………..…i

Preface…………………………………………………………………..…..ii

Table of Authorities……………………………………………………iii

Jurisdictional Statement………………………………………………iv

Standard of Review……………………………………………………...v

Statement of the Issues………………………………………………1

Statement of the Case…………………………………………….2-4

Statement of the Facts……………………………………………5-6

Summary of Arguments…………………………………………..7-8

Arguments…………………………………………………………9-41

Conclusion………………………………………………………….41

Certificate of Compliance with F.R.A.P. Rule 32(a)(7) ………….………………………42

Proof of Service……………………………………………...........43

Attached Required Short Appendix………………………………………44

# PREFACE

In this Appellate Brief, Defendant-Appellee, Sergeant Francis Higgins is referenced as Higgins, the direct supervising sergeant that alleged Plaintiff-Appellant "failed to respond to a burglary in progress." Juan Rivera is referenced as Rivera, the former Chief of the Internal Affairs Division. Jamie Kane is referenced as Sergeant Kane; the supervising and investigating Internal Affairs sergeant. Sergeant Derrick Shinn is referenced as the initial supervising and investigating Sergeant that transferred the CR investigation over to the Internal Affairs Division to determine if the CR allegation was based on discrimination. Former Chicago Police Superintendent Garry McCarthy is referenced as Superintendent. CR is referenced and defined as a complaint register for egregious misconduct committed by Police Officers. The Command Review is referenced as three high ranking Chiefs of the Chicago Police Department (Al Wysinger, Eugene Williams, Dana Alexander) that had the final investigative determination of CRs. Internal Affairs Division is referenced as IAD.

# TABLE OF AUTHORITIES

Afscme v. Dept. of Ctl. Mgmt. Ser 651 N.E.2d 718 (1995)........................................................17

Bell v. City of Milwaukee, 746 F.2d 1205, 1264 (7th Cir. 1984)...........................................18

Bell v. E.P.A., 232 F.3d 546 (7th Cir. 2000)........................................................................24

Biolchini v. General Electric Co., 167 F.3d 1151, 1154 (7th Cir.1999)..............................37

Brewer v. Bd. of Trs. of Univ. of Ill., 479 F.3d 908, 918 (7th Cir. 2007).............................35

Burlington Northern v. White, 126 S.Ct. 2405 (2006)......................................................25

Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 457 (2d Cir. 2009).......................10

Cf. United States v. Holt, 460 F.3d 934 ( 7th Cir.2006)....................................................24

City of Los Angeles Dep't of Water and Power v. Manhart, 435 U.S. 702 (1978).................12

Dennis v. United States, 339 U.S. 162 (1950).................................................................23

Deloughery v. City of Chicago, 422 F.3d 611, 614 (7th Cir. 2005).....................................30

Doe v. Oberweis, 456 F.3d 704 (7th Cir. 2006)............................................................29,40

DPS, State Police v. Rigby, 401 So. 2d 1017, 1981 La. App. Lexis 4151.............................24

EEOC v. Indiana Bell Telephone Company, Inc. Ameritech Corp., 256 F.3d 516 (7th Cir. 2001)...16

EEOC v. Target, 460 F. 3d 946 (7thCir. 2006).................................................................22

Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).........27

Fischer, 519 F.3d at 404..............................................................................................40

Fischer v. Avanade, Inc., 519 F.3d 393, 407 (7th Cir. 2008)............................................24

Forrester v. Rauland-Borg Corp, 453 F.3d 416 (7th Cir. 2006).........................................22

Ghosh v. Indiana Dep't of Envtl. Mgmt., 192 F.3d 1087, 1091 (7th Cir. 1999)....................32

Griggs v. Duke Power Co., 91 S. Ct. 849 (1971).................................................................8

Harris v. Forklift Sys., 510 U.S. 17 (1993).....................................................................40

Hasan v. Foley & Lardner, — (7th Cir. Dec.2008)...........................................................15

Heuer v. Weil-McLain, 203 F.3d 1021 (7th Cir. 2000).....................................................25

Hitchcock v. Angel Corps, Inc., 718 F.3d 733, 738 (7th Cir.2013).....................................32

Holcomb v. Iona College, 521 F.3d 130, 141–44 (2d Cir.2008).........................................33

Huff v. UARCO, Inc., 122 F.3d 374, 380 (7th Cir.1997).................................................31

Humphries v. CBOCS West, Inc., 474 F. 3d 387, 407 (7th Cir. 2007)..............................23

Jackson v. County of Racine, 474 F.3d 493 (7th Cir.2007)...........................................40

Joseph M. Conley v. Village of Bedford Park, 215 F.3d 703 (7th Cir. 2000)...................36

Kalven v. City of Chicago, 2014IL. App (1st) 121846...............................................11-12

Lewis v. City of Chicago, 496 F.3d 645, 655 (7th Cir. 2007)....................................18,38

Lockwood v. Bowles, 46 F.R.D. 625, 634 (D.D.C. 1969).............................................14

Lust v. Sealy, Inc., 383 F.3d580 (7th Cir. 2004)......................................................12

Magyar v. St. Joseph Regional Medical Center, ----- (7th Cir. 2008)...........................18

Mateu-Anderegg, v. Sch. District of Whitefish Bay, 304 F.3d 618 (7th Cir. 2002)............38

Marshall v. Am. Hosp. Ass'n., 157 F.3d 520 (7th Cir. 1998)......................................15

Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 832 (7th Cir. 1985..........................14

Minor v. Centocor, Inc. 457 F.3d 632, 634 (7th Cir. 2006)..........................................8

Monell v. Department of Social Service of the City of New York, 426 U.S. 658 (1978)..........19

Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 651 (6th Cir.2012)........................33

O'Sullivan v. City of Chicago, 01 C 9856 (N.D. Ill. 2007)........................................26-27

Pac. Century Int'l, Ltd. v. Does 1-37, 282 F.R.D. 189, 193 (N.D. Ill. 2012)........................13

Peacock Records, Inc. v. Checker Records, Inc., 365 F.2d 145, 147 (7th Cir. 1966)..............14

Peoria Police Sergeants v. City of Peoria Bd. of Fire & Police 574 N.E.2d 1240.................10
      (Ill. App. Ct. 1991)

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)...................................................23

Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.....................................................13

Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133 (2000)...........................................37

Robinson v. Shell Oil Co., 519 U.S. 337 (1997).....................................................24,33

Rozskowiak v. Vill. of Arlington Heights, 415 F.3d 608, 613 (7th Cir. 2005).....................32

Rudin v. Lincoln Land Cmty. Coll.,420 F.3d 712 (7th Cir. 2005)...................................40

Russell v. Acme-Evans Co., 51 F.3d 64, 69-70 (7th Cir.1995)......................................40

Case: 20-1750    Document: 17    Filed: 09/21/2020    Pages: 90

Spaulding et al v. City of Chicago et al……………...………………………………21

Smith v. Bray, 681 F.3d 888, 897 (7th Cir.2012)……………………………………33

Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011)…………………………………34

Troupe v. May Dep't. Stores, 20 F.3d 734, 736 (7th Cir. 1994)…..…………………15

Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044 (7th Cir. 2000)…………………40

Valentine v. City of Chicago,452 F.3d 670 (7th Cir. 2006)………………..…………40

Vaughn v. Woodforest Bank, 665 F.3d 632, 638–40 (5th Cir.2011)…………………33,36

Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)…………………..…………20

Walker v. Weatherspoon, 900 F.3d 354, 356 (7th Cir. 2018)………………………20

Waterhouse v. Hopkins, 490 U.S. 228 (1989); Lust v. Sealy, Inc., 383 F.3d580……………12,23
    (7th Cir.2004)

Watkins v. McCarthy, 2012 IL App (1st) 100632…………………………..……………37

Watson, 487 U.S. at 991, 108 S. Ct. 2777)………………………………………………31

Williams v. Blagojevich, No. 05 C 4673, 2008 WL 68680, at *3 (N.D. Ill. Jan. 2, 2008)…..……13

# JURISDICTIONAL STATEMENT

This Court jurisdiction pursuant to Rule 3, Federal Rules of Appellate Procedure, as a final judgment was entered on March 26, 2020. Appellant seeks review of all aspects of the final judgment and the granting of Defendants summary judgment. A Notice of Appeal was timely filed on April 24, 2020. This is not a direct appeal from a magistrate judge.

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

## STANDARD OF REVIEW

The District Court excluded evidence which was necessary for Plaintiff-Appellant to satisfy her burden of proof and controvert the arguments of the Defendants-Appellee. By excluding almost in its entirety, Plaintiff-Appellant's evidence, the District Court prejudiced Plaintiff-Appellant. Though, Honorable Judge Chang stated in his memorandum Opinion Order "the evidence is viewed in Watkins' favor." Plaintiff-Appellant submitted substantial evidence and facts as Exhibits but was not considered in the final judgment. Appellant lack of legal training caused her to lose Summary Judgment in favor to Defendant, though merit is plentiful. As stated in Judge Edmond Chang summary judgment order that Appellant erred by "not properly citing her evidence and facts" but all her facts and evidence are within the Docket. However, in this Appellant Brief Plaintiff has ensured to properly cite all facts and evidence to ensure that all evidence and facts can be easily accessible by this Honorable Seventh Circuit Court.

The Defendants-Appellees withheld substantial evidence that only the Defendants had privy to. The most substantial evidence withheld by Defendants was the audio dispatch tape and the Chicago Police Department general orders and directives pertaining to discipline procedure, data and statistics pertaining to discipline. "Here, under the arbitrary, capricious, standard, the Appellate Court's scope of review is even narrower." Under, this standard of review, at minimum, an agency must exercise its jurisdiction where it properly lies. It must not ignore evidence placed before it by interested parties. *Scenic Hudson Preservation Conference v. Federal Power, 407 U.S. 926 (1972).*

# STATEMENT OF THE ISSUES

Whether the District Court's exclusion of Plaintiff-Appellant's admissible evidence prejudiced Plaintiff-Appellant and prevented her from satisfying her burden of proof and violated her constitutional rights.

Whether the false information contained in the Defendants-Appellees' CR investigative memorandum, combined with Plaintiff-Appellant's complaint of discrimination created an issue of material fact.

Whether the Defendants-Appellees' multiple explanations and proffered documentation showing Plaintiff-Appellant's violated department policy was pretextual that caused her to be suspended on March 11, 2014.

Whether Plaintiff-Appellant's evidence raised triable issues of material facts as whether the Defendants-Appellees' stated reasons for suspending Plaintiff-Appellant was pretextual.

Whether the Court's ruling on the Defendants-Appellees motion for summary judgment was against logic and the weight of evidence.

Whether Plaintiff-Appellant have a Cat's Paw against former Superintendent Garry McCarthy.

Whether the false and egregious CR impeded on Plaintiff-Appellant's career mobility, reputation, and promotional opportunities.

Whether Plaintiff-Appellant should have been suspended for engaging in protected activity.

Whether the court erred when using personal opinions in a court ruling.

Case: 20-1750     Document: 17     Filed: 09/21/2020     Pages: 90

## STATEMENT OF THE CASE

Plaintiff-Appellant, Jacqueline Watkins, challenges and seeks review of the District Court's final judgment. The Court grossly abused its discretion in vacating the Status Hearing that was set for April 1, 2020; therefore silencing Plaintiff-Appellants' "side of the story," almost in its entirety, and refusing to allow her voice to be heard. (Docket 117) & (Docket 120). The court granted summary judgment to Defendants on March 26, 2020, therefore dismissing each of Plaintiffs' complaints. The Court improperly excluded nearly all record-cited facts and supporting evidence Plaintiff-Appellant offered in opposition of the Defendants-Appellant's summary judgment motion which directly controverted those allegations, as well as the claims she brought against the Defendants-Appellees. The evidence raised numerous triable issues of material fact as to whether the Defendants-Appellees' stated reasons for the obtainment of the egregious pretext CR, suspension and damage to Plaintiff promotional opportunities and career mobility. More important, the evidence was relevant and necessary to carry Plaintiff-Appellant's burden of proof and, therefore, survive summary judgment. However, as shown throughout this Brief, with her arguments and factual support excluded in nearly their entirety, it was impossible for Plaintiff-Appellant to satisfy her burden of proof and controvert the Defendants-Appellees' numerous allegations against her. The Court, therefore, prejudiced Plaintiff-Appellant, and this violation alone of Plaintiff-Appellant's constitutional rights warrants a reversal of summary judgment.

The factual record is lengthy and nearly all statements are disputed. However, the court excluded nearly every record cited argument and all supporting evidence Plaintiff-Appellant presented, including documentation which demonstrated the Defendants-Appellees' irrefutable and inexplicable justification of obtaining a CR against Plaintiff and denying her similar-situated

comparator, and the repeated false testimony and documentation by Defendants Juan Rivera, Jamie Kane and former direct supervising Sergeant Francis Higgins. Thus, with factual record of pretext the court erred when concluding that Plaintiff did not have a viable "cat's paw" against former Superintendent McCarthy.

Thus, not for the exclusion of Plaintiff-Appellant's evidence, each of the Defendants' claims fail, as Defendants produced not a shred of evidence to support their numerous cause and justification for obtaining the CR and suspending Plaintiff.   Plaintiff controverted each alleged justification for the CR and suspension with record-cited evidence and created issues of material fact.  Plaintiff name continues to be associated with Conduct Unbecoming/Negligent to Duty accessible by FOIA and public google search.   The Defendants were granted summary judgment and Plaintiff was denied her constitutional rights to due process of a fair trial by jury.

The court dismissed Plaintiff-Appellant's case as though her claims of discrimination were trivial and unworthy of the court's fair examination, and inconsequential to our country's important civil right laws.  The excessive delays in the Chicago Police Department in opening and investigating the CR, the omission of Plaintiffs' admissible evidence, and the court's repeated ignoring of the Defendants  numerous false statements and hiding evidence illustrates the Court's bias of Plaintiff and she believes the court treated her prejudicially and egregiously. The court errors were so prejudicial to Plaintiff-Appellant's constitutional rights, and the judgment was so clearly against logic and unjustified by Plaintiff's evidence.

Plaintiff-Appellant respectfully requests that this Honorable Court reverse the District Court's judgment on civil rights pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1983, count I, 42 U.S.C. § 1981-Race and Sex Discrimination, Count II, Section 1983 -

Equal Protection Clause, Race Discrimination; Count III, Race Discrimination-Title VII and

Count VI, intentional inflectional of Emotional Distress charges.

Case: 20-1750        Document: 17        Filed: 09/21/2020        Pages: 90

## STATEMENT OF FACTS

Plaintiff-Appellant, Pro se, Jacqueline Watkins, is a 47-year-old African American female hired by the Defendant's Chicago Police Department as a full-time Patrol Officer on July 12, 1999. Plaintiff had an unblemished work record until she was charged by her supervisor with an egregious and pretext CR at that time, Sergeant Francis Higgins, for her and her partner's alleged "failure to respond to a burglary in progress" call. Plaintiff received a Complaint Register ("CR") #1019842 on September 8, 2008 which was not served upon her until September 25, 2008. Defendant's General orders state that a supervising officer provide immediate admonishment of an offending officer and provide the officer notice of the rule violated, this did not happen here. Plaintiff immediately protested this discriminatory and false CR assignment with Defendant, but the Defendant's Internal Affairs Department ("IAD") took until 2010, two (2) years from the CR creation to even commence its investigation. During this period of investigation Sergeant Higgins was allowed to retire with an open CR and assume another position with the Defendant, without any accountability. (Docket 90-5 p.23-24). In 2010, the charge was also inexplicably changed by the IAD Sergeant Kane to "Failure to properly respond to a burglary in process." Four (4) years after that in 2014, the charge by IAD Investigator Sergeant Kane was changed to "Inattentive to Duty. Despite Plaintiff's repeated requests, Defendant refused to explain the changes to Plaintiff's charges. Typically, an "Inattentive to Duty" charge is considered a less serious transgression resulting in a verbal reprimand or written warning, not meriting the more serious CR determination and a permanent "Stain" on an Officers' record. It is also the policy of Defendant to utilize Progressive Discipline. With no prior disciplinary action, Plaintiff was taken to the most severe level of discipline. Plaintiff complaints about the inaccuracy of this charge were delayed for an unreasonable six (6) years creating statute of limitation issues for Plaintiff that she had no power to control.

The "clear-cut disciplinary issue" occurred when Plaintiff was suspended on March 11, 2014. The Binding Arbitration Award of George T. Rousell, Jr. on December 15, 2015 declared "Her [Plaintiff] record should reflect that the allegation was Not Sustained…" Plaintiff was frequently denied requests for promotional opportunities and stuck in entry level patrol, despite now having 21 years of experience with Defendant, meeting job requirements, 2 master's degrees, several credit hours toward a PhD an unblemished disciplinary record, with the exception of this CR. The negative impact of a CR on a Chicago police officer's career has also been clearly articulated by this court in the matter of *O'Sullivan v City of Chicago, 474 F. Supp. 2d 971 (2007)*. The lack of a fair and timely investigation of what turned out to be a false CR has caused tremendous emotional, financial and career harm to Plaintiff. As known to Defendant, as a matter of Defendant this CR was ordered expunged and the Defendant failed to comply with its own policy for what is now almost 12 years, thereby causing continuous harm to Plaintiff. Former Chief of Internal Affairs Division Juan Rivera informed then Superintendent McCarthy that there had been a finding that the CR was Sustained, which caused Plaintiff to be suspended by the Superintendent on March 11, 2014. (Docket 25 p.1-5).

Case: 20-1750      Document: 17      Filed: 09/21/2020      Pages: 90

# SUMMARY OF ARGUMENTS

The ultimate argument and evidence proving the allegation was Pretext is the fact that Plaintiff won her grievance proving the allegation was a "lie." Thus, labor arbitrator George T. Roumell Jr., whom have an extensive career with six decades of teaching labor and arbitration law at Michigan State University College of Law and a graduate of Harvard law School also investigated the CR and concluded that the allegation against Plaintiff was False and reversed the Sustained finding to Not Sustained on December 2015. (Docket 1 p.17-20) & (Docket 90-9 p.3-6). The arbitrator's summary opinion and binding award dated December 28, 2015; provides genuine dispute of facts in which why Summary Judgment should be reversed, and a jury trial should be upheld. The arbitrator's ruling shows Pretext evidence, inconsistencies and lies in defendant statements. The arbitrator ruling also show facts and evidence that Plaintiff's complaint of discrimination was never taken seriously and disregarded by the statement given by James Rowan "the accused (Plaintiff) statements do not make sense." (Docket 1 p.17-20 & Docket 90-9 p.3-6). Defendant failed to uphold the contract and honor Plaintiff rights of "expunging suspension record," which is clearly stated on the grievance form, which is a direct breach of contract. (Docket 103-2 p.23). It is evident that Sergeant Higgins malicious discriminatory intent was biased and to destroy Plaintiff's career opportunities and work reputation due to her race and gender.

The initial allegation by Defendant Sergeant Higgins alleged that Plaintiff "failed to respond to a burglary in progress." Two years later in 2010 the allegation was changed to a vague allegation "failed to properly respond." Finally, later in 2014 the allegation was changed a third time to a catch-all and subjective allegation "failed to timely respond." (Docket 90-11 p.77, 92 & 101-102). Due to the fact the allegation was changed three times over a seven-year span is fact

and evidence proving pretext to hide discrimination. *McDonnell Douglas, 411 U. S. at 802-04;*
*Burdine, 450 U.S. at 252-56.*

Appellant-Plaintiff has provided proof that she was a recipient of race and sex
discrimination in that the obtainment of such false and egregious CR was sufficiently adverse to
her career. *Minor v. Centocor, Inc. 457 F.3d 632, 634 (7th Cir. 2006).* Plaintiff has two master's
degrees and several credit hours toward a PhD but sat at the bottom entry level patrol for over 18
years. Appellant experience of the discrimination caused defamation in that the wrongful
allegation and suspension was a calculated misrepresentation of Appellant's integrity and work
record. This false and discriminatory allegation "failure to respond to a Burglary in
progress/Conduct Unbecoming" lead a reasonable person to believe that Appellant was lazy,
scary, give false statements, negligent, use the "race and gender card" to negate accountability,
responsibilities and duties. The false allegation placed against Plaintiff is egregious and a career
and reputation destroyer. Sergeant Higgins discriminatory intent was to destroy and impede on
Plaintiff-Appellant career opportunities and he prevailed with his malicious and blatant practices.
It should be noted that Judge Chang "is sympathetic to Watkins's perception of implicit bias on
the part of Higgins, and the Court recognizes the difficulty of proving that a particular action was
motivated by racism or sexism."(Docket 120 p.25). Thus, providing more reason this case
should be remanded for trial. As the adverse employment of being suspended deprived Plaintiff
of employment opportunities by causing her to remain in entry level patrol for over 18 years
without no legitimate reason but discrimination. *Griggs v. Duke Power Co., 91 S. Ct. 849 (1971).*

Case: 20-1750          Document: 17          Filed: 09/21/2020          Pages: 90

# ARGUMENTS

Plaintiff-Appellant admits that she do not score well on exams but is well qualified for promotion based on her merit, interpersonal skills, emotional intelligence, communication skills, experience, education and capability to proficiently adapt and lead; as her resume indicates. (Docket 103-2 p.44-46). The egregious CR **Conduct Unbecoming/Neglect of Duty** placed against plaintiff and being suspended by the former Superintendent of Police Garry McCarthy damaged her career and reputation. (Docket 90-11 p.9) & (Docket 90-4 p.133-134). Former Superintendent Garry McCarthy and former Chief of Internal Affairs Juan Rivera whom both sat on the merit board and have the ultimate final decision who gets promoted on merit basis. The Superintendent, Juan Rivera and other Commanding Officers would never select an Officer for promotional opportunities believing and suspending an Officer found guilty of such egregious allegation that Officers can actually get fired for, as the CR passed through all ranks. (Docket 103-3 p.15-24). It is proven that Officers do indeed get fired by the Superintendent of Police or endure extreme discipline for the same CR placed against Plaintiff. (Docket 103-8 p.15-23). It is also proven in June 2015 that an Officer was **fired** by the Superintendent for similar CR as Plaintiff for "failed to take action." (Docket 90-13 p.15). Judge Chang also asserted that a CR can lead to serious disciplinary action, including suspension, denial of promotion, denial of transfer and possible termination. (Docket 44 p.12). According to Merit promotional opportunities directive, Officers disciplinary history is weighted and considered. (Docket 103-3 p.76-78) & (Docket 90-5 p.48 ¶19-23 & p. 150 ¶ 4-18). The fact that disciplinary history is weighted and considered for promotion is another reason for trial to decipher if the CR impacted Plaintiff promotional opportunities. Plaintiff has provided evidence that the CR damaged her career opportunities and mobility. Judge Chang stated, "it is undisputed that out of the two

methods for advancement—test scores and merit promotion—merit promotion was the only available avenue for Watkins." (Docket 120 p.14). Due to Plaintiff not scoring well on department exams required Plaintiff to rely on promotions by merit which require an exemplary discipline record and work reputation as Plaintiff had no CRs sustained on her record before this egregious CR. The Illinois Appellate Court held that a city's promotional procedure requires police and fire boards to "provide for promotions on the basis of ascertained merit and seniority in service and examination." *Peoria Police Sergeants v. City of Peoria Bd. of Fire & Police Comm'rs, 574 N.E.2d 1240 (Ill. App. Ct. 1991).*

## Similarly Situated Comparator

A plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate that she was subject to an adverse employment action "and that a similarly situated employee not in the relevant protected group received better treatment." *Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 457 (2d Cir. 2009)* (quoting *McGuinness, 263 F.3d at 53*). The court erred in that stating that Plaintiff "failed to make out a *prima facie* case of discrimination, in large part because she has failed to identify any similarly situated individuals who were treated better than her (for instance, someone who did not receive a suspension despite being accused of similar conduct)." (Docket 120 p.26). Plaintiff did not write out the names in the memorandum but indeed identified and provided names of similarly situated one hundred and eight (108) Male and Female Whites treated more favorable concerning discipline as an Exhibit. (Docket 103-4 p.12-15 & 20-32). The names and discipline of twenty (20) Female Blacks treated less favorably can be found within the attached Exhibit (Docket 103-4 p.16-19). In this exhibit (Docket 103-4 p.2-42); provides all the statistical data with names, similar allegations, race, gender and discipline for Black Males and Females and White Males and Females to prove

10

prima facie, pretext and disparate treatment. Appellant-Plaintiff has provided facts and evidence that she was a recipient of sex and race discrimination by providing statistical evidence that Whites and Males are disciplined less harshly than Black Females. (Docket 103-4 p.2-42).

Appellant has provided statistical evidence despite not violating any policy or any wrongdoing. It shows even if Plaintiff was guilty of a transgression, infraction, or violation as alleged that Plaintiff was still penalized more harshly. (Docket 90-5 p.135-138). Plaintiff has provided statistical data to show the disparities in discipline of Black Females verses Whites and Males. Even if Plaintiff was indeed negligent to duty as Higgins alleged against Plaintiff, the punishment is proven to be harsher than similar situated White Officers. Appellant has attached material evidence obtained from (*Jamie Kalven v. City of Chicago)*/ https://invisible.institute/police-data; in that Male White CPD Officers who committed similar conduct that Sgt. Higgins accused Appellant and PO White were not disciplined as severely or not disciplined at all within the 22nd District. The material evidence proves that Male White similarly situated officers CRs were "Unsustained" 82.65%, similar situated Female Whites CRs were "Unsustained" 88.89%, White Males and Females CRs together were "Unsustained" 83.62%, **Black females CRs were "Unsustained" 63.64%,** Black Males & Females CRs together were "Unsustained" 64.47%. Black & White Males CRs were "Unsustained "76.32% within the 22nd District. (Docket 103-4 p.4-11). This material evidence proves that Defendant retaliated against Plaintiff as the data shows facts that there is a strong disparity for being Black and female concerning discipline and the higher probability of being suspended and CRs being "sustained." The data shows that Female Blacks CRs are less likely to be "Unsustained." (Docket 103-4 p.3). There is already an open investigation against CPD for a pattern of practice of severely punishing Blacks over white Officers and sustaining complaints by White

complainants, while ignoring complaints by Black complainants. (*Kalven v. City of Chicago, 2014 IL App (1st) 121846*). The statistical data provides material fact that CPD discriminated and retaliated against Plaintiff in that out of all the CRs filed against Chicago Police Officers; Superintendent McCarthy elected to suspend Plaintiff and White. The data revealed material facts that out of 247,150 CRs filed against Chicago Police Officers only 7% were disciplined; this fact proves retaliation and disparities against Plaintiff. (Docket 103-4 p.1-42). The data proves that Black Females are more harshly penalized for infractions compared to White Females, White Males and Black Males. The data provides fact that Black Female Officers within the 22nd District all received between 1-day suspension up to 20-day suspension. The data for White Female Officers provides fact that 88.89 % of Neglect of Duty CRs; similar to Plaintiff were found "Unsustained." Out of the 18 White female Officers charged with the same allegation "Neglect of duty" only received a "reprimand" and no suspension days or simply "Not-Sustained." (Docket 103-4 p1-42). The Exhibit also shows Plaintiff has provided statistical evidence that the False CR was based on race and sex stereotypes. *Waterhouse v. Hopkins, 490 U.S. 228 (1989); Lust v. Sealy, Inc., 383 F.3d 580 (7th Cir. 2004)*. Evidence that the false CR was obtained based on biases and stereotypes of Female Black Officers are obtained from Sgt. Higgins admissions and statement; "I knew that they were up and clear had been assigned to a midnight car that was probably just coming out from the station." (Docket 90 -12 p.10). Here, Higgins admitted to acting out implicit bias by this statement therefore giving the assigned beat 2221 who were Male White the benefit of the doubt of doing something productive and not being first on the scene of their **assigned** job. Employers may not provide different benefits to women than to men. *City of Los Angeles Dep't of Water and Power v. Manhart, 435 U.S. 702 (1978)*.

12

## Discovery

The City of Chicago law department has a long history of hiding evidence and police discipline during discovery. The City of Chicago Law Department has been repeatedly sanctioned by judges – sometimes with very harsh words – for withholding evidence in lawsuits. Appellant-Plaintiff during her plight towards justice lost (Jill Willis & Ed Fox & Associates) two attorneys. (Docket 73-1 p.1). The discovery system is designed to facilitate truth-finding. However, defendant was deceptive and was blocking discovery efforts towards the truth. Appellant-Plaintiff has proven that racism and biases towards Blacks and Females are problematic and hold a tremendous impact on Officers career mobility. The City bears the burden to show that the purportedly nonresponsive documents should not be produced. "The party opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome, or not relevant." *Pac. Century Int'l, Ltd. v. Does 1-37, 282 F.R.D. 189, 193 (N.D. Ill. 2012) (quoting Williams v. Blagojevich, No. 05 C 4673, 2008 WL 68680, at \*3 (N.D. Ill. Jan. 2, 2008).* Appellant-Plaintiff endured discovery abuse which includes trickery, harassment, threats, and interference with depositions. *Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.* Plaintiff was denied the opportunity to depose Sergeant Higgins to verify and cross examine his statements on the jury stand verses his deposition. Plaintiff was denied the opportunity to depose the Command Review and Union Arbitrator George Roumell who found the CR to be false. The Defendant Attorney told Plaintiffs' former Attorney Jill Willis that Sergeant Higgins was not available for a deposition but later after the fact of the window of opportunity for discovery, Higgins provided a short declaration statement that consist of the least of amount of words (11 pages) and he is the catalyst of this discrimination lawsuit (Docket 90-12 p.1-11). If the Defendant-Appellee was genuine in the performance towards justice, Higgins should have been

13

the first to be deposed but Defendant deceived appellants' former attorney of that opportunity for full and equitable discovery. (Docket 90-12 p.1-11).

Unfortunately, here the Discovery system is "broken" and worked towards the Defendant to allow them a tactical advantage over Plaintiff. The logic is clear: "[T]he law favors discovery and correction of corruption of the judicial process even more than it requires an end to lawsuits." *Lockwood v. Bowles, 46 F.R.D. 625, 634 (D.D.C. 1969).* Appellant –Plaintiff is requesting remand to trial on basis of Federal Rule of Civil Procedure 60(d)(3) violation that allows a party to overturn a final judgment based upon "fraud" so long as it is filed within one year from the date of judgment. *Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 832 (7th Cir. 1985.* We have indicated that an adverse party's fraud or subornation of perjury permits relatively free reopening of the judgment when the perjury goes to the heart of the issue. *Peacock Records, Inc. v. Checker Records, Inc., 365 F.2d 145, 147 (7th Cir. 1966)*; see also *Harre v. A.H. Robins Co., 750 F.2d 1501, 1503 (11th Cir. 1985)* (false testimony on ultimate issue requires vacation of judgment where the defense attorneys know or should have known of the falsity).

Due to Appellant having a negligent Attorney before becoming Pro se; Plaintiff lost the opportunity to depose a key witness and non-biased investigative supervising sergeant Derrick Shinn statement and evidence as he did not find no misconduct by the Plaintiff but referred the allegation to Internal Affairs to investigate Plaintiff's discrimination charge. (Docket 90-11 p.56). Defendant also attempted to hide evidence by blocking Plaintiff from placing pertinent evidence in discovery which includes the audio dispatch tape; Chicago police General Orders and Directives, and pertinent witness statements from the Citizen (Dorian Wilkerson) that called 911 to report the "burglary in progress," and other Supervisors that stated that Plaintiff did not violate any rule or directive. Appellant gave her previous attorney copies of the department

14

General Orders and Directives to place in discovery but later found that Defendant blocked her from entering such pertinent evidence that would easily vindicate Plaintiff. (Docket 90-11 p.79). Thus, due to the fact Appellant lost fair window of equitable opportunity to depose the initial supervising investigator Derrick Shinn; Appellant is requesting that this Court consider sending case back to court for trial. Appellant would like the opportunity to depose Sergeant Derrick Shinn as he stated to Plaintiff that he "did not find any infractions or wrongdoing committed by Plaintiff." Appellant is requesting that this case be sent back to court to depose Sergeant Shinn to obtain his statements on record for cross examination for trial.

## Disparate treatment

Disparate Treatment is proven here in that Sergeant Higgins treated Plaintiff differently from other employees outside her protected class. Beat #2221 (Male Whites) that were assigned the "burglary in progress" call was not stereotyped, given the benefit of the doubt and response time was not questioned. It is evident that Sergeant Higgins obtainment of the false CR was motivated by discriminatory intent, which is proven by both direct and circumstantial evidence. Plaintiff may also proceed under the direct method by offering circumstantial evidence. *Hasan v. Foley & Lardner, — (7th Cir. Dec.2008)*. "Suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't. Stores, 20 F.3d 734, 736 (7th Cir. 1994); see also Marshall v. Am. Hosp. Ass'n., 157 F.3d 520 (7th Cir. 1998)*. **"Suspicious timing"** is presented here as circumstantial evidence proven by statute and evidence in that Sergeant Higgins obtained the false CR on September 8, 2008 and Plaintiff was notified of the CR on September 25, 2008. (Docket 90-11 p.77). Suspicious timing is proven on several levels. The first evidence of suspicious timing is that Sergeant Francis Higgins

failed to interview or conduct an investigation before obtaining the false CR against Plaintiff in that Higgins admitted that he "did not remember if he spoke with or conducted an investigation before obtaining the false CR." (Docket 90-11 p.90).    According to Chicago Police policy and directives, discipline and punishment supposed to be immediately to ensure such behavior will not occur again. (Docket 103-3 p.13).  In addition, according to department policy Officers must be truthful, accurate and conduct a thorough investigation before filing a complaint.  Evidence and facts are provided that Higgins did not conduct an investigation but played into his biases as he admitted "I don't remember if I actually spoke to them after because I was busy." (Docket 90-12 p.11).  Discipline also supposed to be progressive but here Sergeant Higgins did not follow Chicago Police discipline matrix and went to the extreme and obtained a CR. (Docket 103-3 p.71-72 & 91).  After Plaintiff proved that Higgins original CR "failed to respond, "was a lie IAD investigator Kane changed the allegation to "failed to properly respond."  This is evident that the allegation was changed to protect Sergeant Higgins career from a Rule 14 violation (false statement) discipline and his career opportunities. (Docket 103-2 p.6-7).  Plaintiff submitted a To-From Memorandum on October 2, 2008 verifying the CR was false and requesting a CR to be obtained against Sergeant Higgins for the false allegation and discrimination, but the CR against Sergeant Higgins was never obtained, investigated or opened. (Docket 90-11 p.55-59).  Plaintiff was under undue stress waiting for the investigative process to start and to obtain closure to the false defaming allegation.  It was found that prolonging discipline is unreasonable and against policy as it is required that discipline should occur within 30 days for simple allegations. *EEOC v. Indiana Bell Telephone Company, Inc. Ameritech Corporation, 256 F.3d 516 (7th Cir. 2001).* Here, the Seventh Circuit ruling in the Ameritech telephone company provides pretext and more reason to remand this case for trial.  The investigative process did not begin until April 28, 2010;

16

after Plaintiff constructed and mailed a certified memorandum requesting a fair and expeditious investigation to former Superintendent Garry McCarthy and former Chief of Internal Affairs Juan Rivera. (Docket 90-11 p.97-100) & (Docket 103-2 p.11-12, & 25). The investigation then occurred shortly after Plaintiff mailed the letter to Superintendent McCarthy in 2010.

Suspicious timing is exemplified in this allegation on several levels. The complaint is simple, either Plaintiff did her job or not. Such simple complaint should not have taken seven years to conclude. It is evident that Defendant extended the investigation timing to allow Sergeant Higgins and IAD Sergeant Jamie Kane allotted time to retire in "good standing" without accountability for Rule 14 violations/False statements and to impede on Plaintiff statute of limitations. The FOP union contract states "Unless the Superintendent of Police specifically authorizes in writing, no complaint or allegation of any misconduct concerning any incident or event which occurred five (5) years prior to the date the complaint or allegation became known to the Department shall be made the subject of a Complaint Register investigation or be re-opened or re-investigated after five (5) years from the date the Compliant Register number was issued." (Docket 90-15 p.6). Sergeant Higgins retired November 15, 2010 and obtained the false and discriminatory allegation on September 9. 2008. (Docket 90-12 p.2). Plaintiff was suspended six years later on March 11, 2014. (Docket 90-4 p.62 & Docket 90-11 p.9). Here evidence and fact of suspicious timing is in play here to trigger the "5 year prior" protection. "Discipline shall be imposed as soon as possible after the employer is aware of the event or action giving rise to the discipline and has a reasonable period of time to investigate the matter." *Afscme v. Dept. of Ctl. Mgmt. Ser 651 N.E.2d 718 (1995).*

Higgins also retired with an open and sustained EEO CR lodged against him on January 3, 2009 by a Male Black for false arrest, failure to ensure Civil Rights. However, was allowed to

retire November 15, 2010 and the CR was sustained the following year after Higgins retirement with no discipline, with only "Sustained –violation noted." (Docket 103-7 p.2, 21-22). Thus, here again reveals the disparity of discipline for (Higgins) Male Whites and no accountability and repercussions for Higgins discriminatory practices. The court erred again of granting summary judgment in that even Judge Chang stated, "it is unclear why these interviews took place nearly a year and a half after the complaints were assigned to Sergeant Kane." (Docket 120 p.8). Thus, here again timing is questioned as to Pretext and give more reasons the case should be sent to trial. The amount of time that passed between the protected activity and the adverse employment action can be probative of the retaliatory motive. *Magyar v. St. Joseph Regional Medical Center, ----- (7th Cir. 2008)*(on employer's Rule 56 motion, suspicious timing clock starts at most plaintiff-favorable time); *Lewis v. City of Chicago, 496 F.3d 645, 655 (7th Cir. 2007).*

## The Cover-Up of Pretext

Appellant is a victim of a cover-up. *Bell v. City of Milwaukee, 746 F.2d 1205, 1264 (7th Cir. 1984).* Sergeant Higgins obtained a false and biased allegation stating that Appellant "failed to respond to a burglary in progress." (Docket 90-11 p.77). In effort to cover-up the false allegation committed by Appellee-Defendant and to protect Defendant Higgins from civil liability; IAD Sergeant Jamie Kane assisted in the covering up by noting false investigatory notes in the conduct of the investigation. The cover-up and lies are clearly articulated by the Command Review in which all three Command Review Officers documented the facts and finding lies in IAD Sergeant Kane investigation and classifying the CR as Not-Sustained. (Docket 90-11 p.28-33). Plaintiff is requesting that the Court send the case to trial to allow Appellant the opportunity to play Audio tape to show that IAD Investigator documented lies by stating "there was a delay in the Officers

answering the radio, as Plaintiff answered up immediately" indicated by the Command Review. (Docket 90-11 p.31).

According to CPD directive Radio Communications, GO3-01-01 clearly proves pretext and material fact that Plaintiff and White did not violate any rule or directive. Radio Communications directive states that "Dispatchers assign the jobs and that the dispatched beat of assignment must respond to their assigned job." Here is Material Fact that Higgins elected to order Plaintiff and White in a hostile tone and singled Plaintiff and White out to respond to the "Burglary in progress" after Bt. #2221 was already dispatched and assigned. Plaintiff and White then followed Higgins orders relayed by the dispatcher and immediately responded. There is no order or directive that states that Officers must respond to a job that is assigned to another beat but must respond upon being dispatched. It is proven pretext as the directive clearly states that Dispatchers assign jobs and initiate discipline if an Officer fail to answer a radio call. (Docket 103 p.3 ¶11) & (Docket 103-3 p.44-48). Here, it is proven disparity and pretext as Higgins unjustly took it upon himself to also assign Plaintiff the "burglary in progress" though he self-admitted Plaintiff and White immediately responded upon Higgins order relayed by the dispatcher. (Docket 90-11p.62).

The Defendants' actions violated Plaintiff's equal protection rights and that the City is liable under *Monell v. Dep't of Soc. Servs. of the City of New York, 426 U.S. 658 (1978)*. The Appellee-Defendant failed to open and investigate Appellants' complaint of discrimination. The Defendant was mandated to open, investigate and obtain a separate EEOC CR (Complaint Register) against Sergeant Higgins. (Docket 90-11 p.8 ¶23). Defendant violated Plaintiffs' 42 U.S. Code § 1983 procedural due process right of the first, fifth and fourteenth amendments of the United States Constitution by not opening her discrimination complaint and changing the initial complaint from "failed to respond" to "failed to properly respond" without clearly and refusing to

Case: 20-1750      Document: 17      Filed: 09/21/2020      Pages: 90

articulate what Plaintiff did improper. (Docket 90-11p.42, 62, 77 & 92). Defendant continuously argued that Plaintiff complaint of discrimination was untimely and hid the fact that Appellant immediately and continuously complained of discrimination, but Appellee failed to open a discrimination complaint. *Walker v. Weatherspoon, 900 F.3d 354, 356 (7th Cir. 2018).* It is proven in memorandum that Plaintiff immediately complained of discrimination upon being served the false the allegation. (Docket 90-11 p.55-59). Former Chief of Internal Affairs Juan Rivera stated in his declaration "Sgt. Kane found there was insufficient evidence to serve Sgt. Higgins with allegations that he had acted in a discriminatory manner or that he had lied in his allegations against the Accused Officers." (Docket 90-11 p.8). Thus, this statement by Juan Rivera is evidence that Defendant violated Plaintiff's equal rights by never opening an EEO CR against Sergeant Higgins. According to the Chicago Police Department directives and policy and Federal laws when a Supervisor receives an EEO complaint a CR and EEO# complaint must be obtained and reference the original complaint. (Docket 103-3 p.4, 57). Thus, here again Defendant denied Plaintiff equal rights by refusing to open her discrimination complaint against Sergeant Higgins. Here again Appellant plead to court for trial as to seek testimony and discovery that Plaintiff complaint of discrimination was never opened or investigated.

Appellant argues that the Equal Protection Clause protects individuals against arbitrary and irrational treatment by state action, even if such action is not taken due to a plaintiff's membership in any particular class. In other words, Appellant maintains she has a "class of one" equal protection claim against the Defendants. "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the Appellant alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village. Of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).*

Case: 20-1750      Document: 17      Filed: 09/21/2020      Pages: 90

Case: 20-1750    Document: 17    Filed: 09/21/2020    Pages: 90

Chief Rivera has a long history of covering up material evidence and refusing to open complaints against Supervisors. Material evidence revealing Chief Rivera history of retaliation against female Officers are revealed in the lawsuit *Spalding et al v. City of Chicago et al*. In this lawsuit Chief Rivera twice refused to open a CR that Spalding and Echevarria requested to be open against a Supervisor. Shannon Spalding and Danny Echeverria filed a whistleblower suit, claiming they had suffered retaliation for reporting and investigating criminal activity within the department. They repeatedly asked Chief Rivera to investigate the retaliation against them, but he told them, "'Look, everyone is against you, so you don't want to piss me off.'" Chief Rivera also threated them by stating if they file a CR that "they should expect to be on the receiving end of severe retaliation." Spalding and Echeverria accused Juan Rivera, who at the time was the head of the Police Department's Bureau of Internal Affairs, of leaking information about their involvement in the investigation to a supervisor, who in turn told others in the chain of command. When word got back to the officers that their work had been exposed, they said they confronted Rivera in the hallway outside his office at police headquarters. Rivera further retaliated against Shannon Spalding and Danny Echeverria by transferring Spaulding and Echeverria out their unit into a small room. In this lawsuit Spalding recounted a story that an IAD investigator was told by Chief Rivera to "unfound" a CR against a Supervisor that he found substantial evidence and closed "sustained." Appellant is curious was this her CR or simply among several he abused his power with lies and deceit. *(Spalding et al v. City of Chicago et al)*.

Chief Rivera was found to have a pattern to retaliate against Officers for exercising their 1st and 5th Constitutional rights. Evidence is provided in that Rivera increased Plaintiff's partner White suspension in a separate CR#1061265 from a five (5) day suspension to a twenty (20) day suspension without any justification or investigation in July 2014. Concerning this CR, Plaintiff

Case: 20-1750     Document: 17     Filed: 09/21/2020     Pages: 90

wrote Superintendent Garry McCarthy a To/From memorandum dated July 22, 2012; requesting that the false CR be immediately expunged or "unfounded." Chief Rivera responded to the memorandum by order of Superintendent McCarthy the CR investigation has been completed, but Plaintiff was suspended 2 years later. Thus, the untimeliness of suspending Plaintiff after Rivera stated the investigation was completed is further evidence of retaliation. (Docket 103-2 p.11-12 & 25-26).

### Proof of Pretext

The employer must provide a nondiscriminatory reason which is sufficiently specific such that plaintiff can attempt to show pretext. *EEOC v. Target, 460 F. 3d 946 (7thCir. 2006).* Judge Change agreed "the facts alleged by Watkins, the filing of the allegedly false CR could support a claim of intentional employment discrimination." (Docket 44 p.13). Appellant has provided multiple reasons for adverse action and numerous facts and evidence to support Pretext. If the employer's stated reason is not the true reason, the case cannot be decided on summary judgment. *Forrester v. Rauland-Borg Corp, 453 F.3d 416 (7th Cir. 2006).* Here evidence and facts are provided that the original allegation stated that Appellant-Plaintiff "failed to respond to a burglary in progress." (Docket 90-11 p.77). Higgins admitted in his interview with IAD Jamie Kane that Plaintiff and White responded after his "hostile" order requesting that Plaintiff and White to respond. Higgins statement proves discrimination, blatant implicit bias and feelings of superiority; "after passing me they continued south bound away from the burglary in progress for at least another block and a half until I came on the radio and told them to follow me to the burglary in progress. I knew they were up and clear and the job had been assigned to a midnight car was probably just coming out from the station." (Docket 90-12 p.10). This statement proves discriminatory "slave master syndrome of superiority and intimidation" in that it implies

22

that Plaintiff should have been in fear of his existence and just followed him, though plaintiff never saw Higgins in passing. *Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)*. This statement also proves "bias" by Higgins assuming Plaintiff and White were lazy and dodging work when in fact Plaintiff were enroute to get gas before checking off; as the job was assigned to a midnight shift (Bt. 2221); but immediately responded upon Higgins request. (Docket 90-5 p.72 ¶1-24). Higgins never conducted an investigation into his biased complaint against Plaintiff but went on his biased assumption and lodged a CR against plaintiff. *Dennis v. United States, 339 U.S. 162 (1950)*. Higgins exonerated Plaintiff of any wrongdoing by admitting and stating that Plaintiff responded upon his request. (Docket 90-12 p.10). This is fact and evidence proving Pretext in that Higgins admitted that Plaintiff committed no wrong. Plaintiff and White got gas after assisting the assigned beat 2221 and Sergeant Higgins, which caused Plaintiff to get off late. Plaintiff's vehicle was under a quarter tank of gas and it is against policy and regulations to turn a vehicle in under a quarter of tank according to CPD directive titled Vehicle Consumable U02-01-04. (Docket 103-3 p.43) & (Docket 90-4 p.33-43, 56). Plaintiff and her partner White upon being served with the CR, submitted a memorandum providing facts and evidence that the allegation was false and discriminatory. (Docket 90-11 p.79, 82-83), (Docket 90-4 p.33) & (Docket 90-5 p.149 ¶3-10). After Plaintiff submitted facts that the allegation was indeed a lie the investigation was halted two years later in 2010. In 2010 the allegation was changed from "failed to respond" to "failed to properly respond." (Docket 90-11 p.80, 92). To prove pretext, plaintiff must present evidence that impeaches the employer's stated reason for its employment decision. Plaintiff generally must show that the employer did not sincerely believe its proffered reason. *Humphries v. CBOCS West, Inc., 474 F. 3d 387, 407 (7th Cir. 2007)*. It is evident that Defendant justification is a lie rather than a simple mistake, as the allegation was

changed three times within a seven-year span. To prove discrimination one must show the reason is simply pretext and Appellant has provided evidence that the allegation is a lie and provided evidence that the employer's belief was incorrect may suggest that the employer's stated explanation is insincere. *Bell v. E.P.A., 232 F.3d 546 (7th Cir. 2000)*. Furthermore, pretext can be shown where the employer gives one reason at (suspension) termination but then offers another later (and that one lacks documentation). *Fischer v. Avanade, Inc., 519 F.3d 393, 407 (7th Cir. 2008)*. IAD chief Juan Rivera never documented his justification to go against the Chain of Command Review findings of Not-Sustained. Here, the investigation notes section is bare of any investigative notes by Juan Rivera. (Docket 90-11p.27-33).

### Retaliation

Title VII prohibits discrimination against a current or former employee or a job applicant "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). *Robinson v. Shell Oil Co., 519 U.S. 337 (1997)*. The court supported trial but erred in granting summary judgment by stating that "Watkins has provided just enough circumstantial evidence to permit a reasonable jury to infer a causal link between her 2008 memorandum and Kane's 2011 recommendation for suspension." (Docket 120 p.30). In any event, the evidence of discrimination was inextricably linked to the evidence of retaliation. *Cf. United States v. Holt, 460 F.3d 934 (7th Cir. 2006)*. Retaliation is proven in that Plaintiff's partner White was the driver of the vehicle and had a more extensive discipline record than Plaintiff but IAD Sergeant Kane initially classified the CR as "no penalty" and later on November 21, 2011 increased plaintiff's penalty to a 2 day Suspension. (Docket 90-11 p.32-33). A reprimand was not allowed to be increased to more serious punishment at a later time. *DPS, State Police v. Rigby, 401 So.*

*2d 1017, 1981 La. App. Lexis 4151.* Kane only pursued a Reprimand for discipline for White; while pursued a 2 day suspension for Plaintiff but eventually suspending Plaintiff and White for 1 day. The disparity in seeking to suspend Plaintiff more harshly for 2 days verses only seeking a reprimand for White is clearly evidence of retaliation and proves a causal link. Evidence and facts are provided proving retaliation against Plaintiff for complaining of discrimination in that initially Kane also classified plaintiff's partner CR as "no penalty" and later June 20, 2012; Juan Rivera decreased White penalty to a reprimand after Kane increased White penalty to 1 day Suspension on November 21, 2011. (Docket 90-11 p.39 & 48). Sergeant Kane and Juan Rivera stated reason for Higgins CR is a pretext to hide discrimination. *McDonnell Douglas, 411 U. S. at 802-04; Burdine, 450 U.S. at 252-56.* Plaintiff refused to accept the false CR on her record and continuously complained of discrimination by constructing several memorandums to department and external officials which caused Kane to retaliate against plaintiff and severely punish Plaintiff harsher than her partner White. (Docket 103-2 p.2-43). Retaliation is further proven in that IAD investigative sergeant Kane got angry and "excoriated" Plaintiff for bringing allegations of race and gender bias against Sergeant Higgins by stating "how you dare defame his reputation with a discrimination charge." Thus, also proving pretext as she typed her own notes and the investigation was not recorded. (Docket 44 p.4 & Docket 90-4 p.89, 93). An employer who creates or tolerates a hostile work environment (intimidating threats, etc.) against a worker who has filed a charge of discrimination may be liable for retaliation. *Heuer v. Weil-McLain, 203 F.3d 1021 (7th Cir. 2000).*

An employment action is materially adverse if it would deter a reasonable worker from complaining of discrimination. *Burlington Northern v. White, 126 S. Ct. 2405 (2006).* White refuted the CR as false but did not complain of discrimination early on due to fear of retaliation;

though her deposition given close upon her retirement clearly articulates that Higgins obtained the false CR due to discriminatory practices. (Docket 90-5 p.20-23). Though, White did not initially attempt to file a discrimination charge, but White did complain that the CR was false, and Kane failed in inquire in her investigation if she believed if the CR was obtained based on Higgins discriminatory practices. (Docket 90-5 p.191-197). The court should take notice that White clearly stated throughout her deposition that the CR is false and was obtained due to Higgins biases against Female Blacks. It is well known that speaking out against injustice that there is high probability to be retaliated against as White attempted to file a discrimination charge close upon her retirement this year, August 2020. White had previous CRs sustained verses Plaintiff had an unblemished disciplinary record with no sustained CRs. Comparing Plaintiff discipline history of no sustained CRs to her partner extensive CR history is evident that retaliation occurred because Plaintiff continued to complain of discrimination in memorandums. (Docket 103-2 p.8-43) & (Docket 103-5 p.3-7). It is clear that retaliation was continuously perpetuated in that Plaintiff continued to fight the false CR but her partner had ceased. On December 28, 2015, Plaintiff CR was reversed and the one (1) day suspension was restored but her partner's CR was not reversed and still sit on her record Sustained. (Docket 1 p.20) & (Docket 103-5 p.8-9). Thus, the damage had already been done despite the CR being reversed seven (7) years later. By not reversing the CR of her partner proves retaliation because Plaintiff CR was only reversed because she refused to be silent against injustice. There is material evidence in the *O'Sullivan vs. City of Chicago* in which Lieutenant Lilly Crump-Hales testified that "CR records were reviewed in connection with promotions." The CR created a "stigma" that impeded on Plaintiff promotional opportunities by preventing Plaintiff from a higher pay scale that would also place Plaintiff with a higher pension upon retirement. (Docket 90-5 p.15 ¶5-24 &

p.46 ¶13-15). It is proven with material evidence that the CR damaged Plaintiff's career in O'Sullivan vs. City of Chicago in that the jury "did-properly conclude that CRs were significant and were an actionable form of retaliation, the inevitable and intended of which was to harm the plaintiffs." Here, it was proven suspension without pay satisfied the materially adverse employment action test. It was also found that "CRs destroyed any chances for promotion, regardless of the good faith of the Board." The jury was entitled to conclude that the CRs were pretextual and retaliatory. Here, it was proven that Supervisors did not lake out CRs against officers unless the event was egregious, or they intended to harass or "get" the officer. *O'Sullivan v. City of Chicago, 01 C 9856 (N.D. Ill. 2007).*

## Hostile environment

In order for harassment to approach the level of a hostile work environment, it must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998).* Plaintiff's work environment is found to be hostile and abusive. Plaintiff is continuously experiencing reprisals and harassment from filing this lawsuit but refuse to file another lawsuit due the ongoing stress from the current lawsuit. Plaintiff is requesting that the Court send the case to trial for restitution and that Plaintiff may feel some sense of vindication as Plaintiff continuously endure humiliation and innuendos that she "plays the race card" and "always playing the victim." Currently, when Plaintiff address small issues some Supervisors and Co-workers are now afraid that plaintiff is going to file a lawsuit and simply a trouble a troublemaker seeking to stir up chaos and "hostile." This injustice has created emotional stress and damaged Plaintiff career opportunities and mobility. By the grace of God it took a Non-biased Male White Supervisor to overlook the false CR and evaluate Plaintiff based

Case: 20-1750    Document: 17    Filed: 09/21/2020    Pages: 90

Case: 20-1750    Document: 17    Filed: 09/21/2020    Pages: 90

on Plaintiff's "content of character" and give plaintiff a fair opportunity to teach Crisis

Intervention (de-escalation skills) to Police Officers at the Chicago Police Education and

Training Academy. Plaintiff's steps to complete this Appellant brief causes plaintiff to still

endure roadblocks, deceit and cover-up from the Defendant in that the Internal Affairs Division

lied to Plaintiff; refusing to allow her look at her disciplinary file on August 10, 2020; as agreed

per contract and memorandum. The Chicago Police Department Internal Affairs perpetuate

injustice, cover-up, lies and systemic racism and needs to be completely dismantled and

reformed. The Defendant was corrupt and unjust during the settlement conference held on

March, 21, 2019; defendant refused to take accountability for any wrong doing and assumed that

Plaintiff lacked integrity and was simply "money hungry."(Docket 71 p.1). Defendant offered

Plaintiff an offer for settlement without taking accountability for its wrong without Unfounding/

Expunging the false CR off Plaintiff's record. Defendant was condescending and invalidated

Plaintiff's experience during the settlement conference by calling Plaintiff complaint a "nuisance

complaint." Plaintiff at that that point was exhausted and was willing to settle with the inclusion

of expunging/unfounding the CR off her record. Defendant stated that he could not make that

decision to expunge the CR off Plaintiffs' record but "would have to ask the Superintendent of

Police." Plaintiff agreed to wait until Defendant ask former Superintendent Eddie Johnson for

permission to settle this lawsuit by expunging/unfounding Plaintiffs' record of the egregious CR.

However, defendant returned to court and refused to expunge/unfound the CR and Plaintiff

refused the settlement offer. Plaintiff's former Attorney Jill Willis practically begged Plaintiff to

settle because she took the lawsuit on contingency basis and only wanted to get out and get paid.

That day because Plaintiff refused to settle without the egregious CR expunged/unfounded off

her record; plaintiff's then Attorney dropped Plaintiff and Plaintiff continued her plight towards

justice and filed Pro se. (Docket 79 & Docket 80).

Merely, fighting for Justice creates a hostile work environment on every level as the City

of Chicago attorneys supposed to always fight for justice regardless who is the defendant or

plaintiff. The retaliation and bullying continue against Plaintiff in that Defendant is demanding

that Plaintiff pay its Bill of Cost totaling $2027.00. (Docket 124 p.1-6). It is evident that

Defendant is punishing and retaliating against Plaintiff for the audacity to stand up for herself

and fight discrimination as the defendant filed the demand for Bill of Cost on April 27, 2020;

three days after Plaintiff filed her Notice of Appeal. (Docket 122 & Docket 124 p.1-6). How is it

that Defendant offered a settlement but later demand Plaintiff to pay Bill of Cost?

### Emotional Distress

A plaintiff who claims emotional distress damages will likely be required to turn over

psychiatric records. *Doe v. Oberweis, 456F.3d 704 (7th Cir. 2006).* Plaintiff is experiencing

consistent emotional stress fighting for justice. (Docket 90-5 p.164 ¶ 9-15 & p.166 ¶17-24).

Plaintiff sees a Licensed Clinical Professional Counselor weekly to deal with emotional stress

and retaliation of fighting the unjust system, especially being pro se. Plaintiff has endured

emotional stress and embarrassment as she was teased of having several advanced degrees but

sat at entry level patrol for 18 years of her career at the same level that only requires a high

school diploma. This CR has held plaintiff back as she continued advancing her education for

promotion, job satisfaction and to earn more money. However, this discriminatory CR has only

caused more financial debt of student loans but no career advancement. Plaintiff plead the court

to send this case to trial to verify through psychiatric records, student loan records and witness

testimony how this false CR and pursuit to justice with this lawsuit has taken an emotional toll on Plaintiff. (Docket 90-5 p.164 ¶9-14 & p.165 ¶17-24).

Furtherance of emotional stress by Defendant was in that Plaintiff's deceased husband (Edward A. Watkins Sr.); a retired Chicago Police Sergeant who was suffering from stage four cancer at the time and was infuriated by the obtainment of the discriminatory CR. Plaintiff's husband knew that such egregious CR would impede on Plaintiff's promotional opportunities. Plaintiff literally spent her last years fighting this false CR alongside her husband. (Docket 90-16 p.6). Plaintiff's husband also did not score high on promotional exams as reported by the *Chicago Tribune (1998)* and was meritoriously promoted to sergeant in 1998; alongside other high ranking Officers and knew that an exceptional disciplinary history and reputation was required for merit promotion. (Docket 103-2 p.51-52). Plaintiff's last years with her hubby was spent fighting this false CR; as he succumbed to cancer on December 23, 2011. Plaintiff should have never had to spend her last years with her husband fighting injustice as his dream for Plaintiff was to get promoted throughout all the ranks up to Deputy Chief.

### Merit Selection Criteria

The Superintendent of Police makes the ultimate determination of who is to be promoted. *Deloughery v. City of Chicago, 422 F.3d 611, 614 (7th Cir. 2005)*. The former Superintendent McCarthy suspended Plaintiff for the false and discriminatory CR on March 11, 2014. (Docket 90-9 p.2). Besides discharge, demotion, lack of promotion, harassment and retaliation, other "adverse" conditions of employment can be actionable, such as loss of a more distinguished title, loss of benefits, or diminished job responsibilities. *Lewis v. City of Chicago, 496 F.3d 645, 653 (7th Cir. 2007)*. Plaintiff admits that she does not score well on exams but provided evidence that she passed part one of all promotional exams that placed her eligible for all merit

promotions. Plaintiff scores were high enough to be meritoriously promoted. (Docket 90-10 p.54, 105-106). Plaintiff placed 1,534 out of 3,551 whom participated in the 2006 Sergeant Examination. (Docket 90-10 p.54 & 103). The 2006 Sergeant Merit eligible list was cancelled December 4, 2014. (Docket 90-10 p.106). Plaintiff was hopeful and working diligently towards being promoted up the ranks to Sergeant, Lieutenant, Captain and finally Deputy Chief. Though, Plaintiff did not score high enough to get promoted off raw test score. Plaintiff was hopeful for Merit promotion and this false CR damaged that opportunity. The disparate impact theory of Title VII liability may be utilized to challenge both objective and subjective selection processes. *Watson. 487 U.S. at 991, 108 S. Ct. 2777.* According to Jill May declaration, the testing manager with the department of human resources "merit promotions are at the CPD Superintendent's discretion." (Docket 90-10 p.6). Plaintiff plead the court to send case to trial to have Jill May attest to her words "merit promotions are at the CPD Superintendent's discretion." This statement by Jill May will reinforce a jury that the false CR did indeed damage Plaintiff promotional opportunities because the Superintendent suspended plaintiff and believed Plaintiff was negligent to duty. (Docket 90-11 p.9 ¶30). Plaintiff provided evidence in an Exhibit with names of hundreds of Male White Officers that were meritoriously promoted over Plaintiff regardless of scoring low, less seniority and many scoring lower on the Sergeant exam than Plaintiff with less education and extensive disciplinary history. (Docket 103-6 p.3-80). The sort of evidence relevant here is "evidence that plaintiff was qualified for the job in question but was passed over in favor of ... a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief or a mere pretext for discrimination." *Huff v. UARCO, Inc., 122 F.3d 374, 380 (7th Cir.1997).* It should be also noted that because the Chief of Internal Affairs Juan Rivera also "allegedly" believed that Plaintiff was

negligent to duty and sat on the Merit Board closely with former Superintendent McCarthy that her promotional opportunities were indeed "doomed." (Docket 103-6 p.68-71). As it should be noted by the court that Juan Rivera was Chief of Internal Affairs from March 2009 until his retirement October 2015 with authority and power over Plaintiff's career opportunities and mobility. (Docket 90-11 p.2 ¶2). Many of the Males and Whites who scored lower than Plaintiff and had less education and were meritoriously promoted over Plaintiff. Plaintiff ask the court to consider trial in that according to the Merit Board directive that "complimentary history and CR disciplinary history will be considered for all meritorious promotions." (Docket 90-14 p.9-11 & Docket 25-2 p.14). Eleven years have passed since the obtainment of this egregious and false allegation and at this point if this false CR did not occur Plaintiff would have been at least a Deputy Chief by now; as Plaintiff requested as a settlement offer to be promoted to Deputy Chief of Diversity and Inclusion. *Ghosh v. Indiana Dep't of Envtl. Mgmt., 192 F.3d 1087, 1091 (7th Cir. 1999).*

## Cat's Paw Theory

Here the Seventh Circuit's "cat's paw" theory makes sense here as Judge Chang explained that Plaintiff could prevail if she shows that a biased supervisor (so, either Kane or Rivera or both) exerted influence over McCarthy's decision. *Rozskowiak v. Vill. of Arlington Heights, 415 F.3d 608, 613 (7th Cir. 2005). (Docket 120 p.32).* Sergeant Higgins and Sergeant Kane documented lies (the polite term is "pretext"). It is clearly evident that Plaintiff did not violate any rule or directive as proven by the Arbitration ruling of Not-Sustained. The court should take notice that Judge Chang verified and noted facts and evidence that "White mostly corroborated Watkins's version of events from the night of the burglary call." (Docket 120 p,10). Plaintiff clearly proven reliable as her record indicate that she has never been suspended for such egregious act. *Hitchcock*

*v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir.2013) ("shifting explanations" for an adverse employment action may give rise to an inference of pretext); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 651 (6th Cir.2012) (jury could reasonably disbelieve an employer's explanation for a decision inconsistent with the employer's prior conduct); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 638–40 (5th Cir.2011) (an employee can create a litigable issue by submitting evidence that disputes the employer's charge of "unsatisfactory conduct"); *Holcomb v. Iona College*, 521 F.3d 130, 141–44 (2d Cir.2008) (a reasonable jury could choose among several possible motives when weighing evidence for and against alleged discrimination). Judge Chang himself noted lies/Pretext by indicting the Command Review also recommended changing the CR finding from "sustained to not sustained" and questioning "why the interview investigation took place nearly a year and a half after the complaints were assigned to Sergeant Kane." (Docket 120 p.8 & 12). This is emphasizing his belief that a reasonable jury could conclude that Plaintiff was indeed discriminated against due to her sex and race and retaliated against for complaining of discrimination. These are factual issues for a jury to resolve.

In fact, former Superintendent McCarthy had never met Plaintiff and there is nothing to suggest that he knew her race. Moreover, Superintendent McCarthy was a **cat's paw**, which is to say an unknowing tool of Rivera and Kane. *Smith v. Bray, 681 F.3d 888, 897 (7th Cir.2012)*. Superintendent McCarthy based his decision on Juan Rivera and Kane wish to retaliate against the plaintiff and duped the Superintendent into taking adverse action against the plaintiff and suspended her. *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018). Juan Rivera unwittingly manipulated the Superintendent to suspend Plaintiff by evidently not sharing Command Review investigation and findings. It is proven that Juan Rivera did not investigate the CR but based his findings without fact or evidence but by animus. There are no investigative notes by Juan Rivera

Case: 20-1750     Document: 17     Filed: 09/21/2020     Pages: 90

required by CPD policy and proven in Exhibit C. (Docket 90-11 p26-33). It is proven that the CR is pretext by the arbitration award of reclassifying the CR from Sustained to Not Sustained. Animus is proven against the Plaintiff in that Juan Rivera (biased non-decision-maker) failed to conduct an investigation; proven by no investigative notes written by Juan Rivera but only by Command Review and Arbitrator George Roumell. (Docket 90-11 p.28-32 & Docket 1 p.17-20). It is evident that Juan Rivera harbor hostility and animus against Plaintiff in that though Plaintiff won her grievance and the CR was reclassified; Rivera stating and still maintains "I agreed in June 2012, and still agree with the investigator's original finding of sustained." (Docket 90-11 p.8). It should be noted and evidence that deception and trickery is proven by Juan Rivera concurring with Command Review findings by simply indicating "NO" Concur and decreasing the suspension from 2 day to 1 day suspension. (Docket 90-11p.32). Thus, proving Juan Rivera was infuriated and harbor animus by Plaintiff's complaint of discrimination and did not consider the facts and evidence.

Superintendent McCarthy was the formal decision-maker in the process of making an adverse employment decision with no discriminatory intent but was contaminated by the information received from front-line biased supervisors (Juan Rivera, Sergeant Kane & Sergeant Higgins) who harbored discriminatory animus against the affected employee. *Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011).* Cat's Paw Theory is clearly articulated here and proven in that the Superintendent (decision maker) failed to verify that prior measures or recommended disciplinary actions are justified, properly supported, and based on legitimate nondiscriminatory reasons. Decision-makers should conduct independent investigations prior to taking adverse employment actions. A proper independent inquiry becomes even more transcendental for ultimate employment decisions and in situations in which a supervisor's actual or potential bias

has been brought to the decision-maker's attention. The Superintendent failed to investigate and obtain sufficient information to support a conclusion that Juan Rivera (non-decision maker) decision to sustain the CR was not biased. Superintendent McCarthy clearly fit the cat's paw theory in that he merely rubberstamped Juan Rivera's decision without confronting and questioning the alleged biased (non-decision-makers) supervisors (Juan Rivera, Sergeant Kane and Sergeant Higgins) lies and issues under consideration.

The court erred the surprising fact that that IAD Chief Juan Rivera failed to submit a single document that he conducted his own investigation instead of taking Jamie Kane investigation as his own over the CCR (Command Channel Review) whom all conducted separate investigations and noted "lies" and inconsistencies in the allegation and classified that CR as False/Unsustained. According to Chicago Police Directives and Policy the Command Review have the final determination of a CR. (Docket 103-3 p.36). The Command Review consisting of three high ranking supervisors Dana Alexander, Eugene Williams, and Al Wysinger all classified the CR as false/unsustained. (Docket 90-11 p.32). On February 22, 2012; Deputy Chief Dana alexander stated in his findings "the reporting Deputy Chief has **carefully** reviewed this CR investigation and does not agree with the current findings and disciplinary recommendations for the following reasons...." Chief Eugene Williams and Chief Al Wysinger both concurred with Deputy Chief Dana Alexander findings. (Docket 120 p.30-32). However, Juan Rivera abused his power, evaded department policy, and elected to sustain the CR over the Command Review and deceived the Superintendent that the CR was truthful. Sergeant Higgins's discrimination was the proximate cause of an employment decision and Superintendent McCarthy was totally dependent on Juan Rivera to supply the information on which to base that decision. *Brewer v. Bd. of Trs. of Univ. of Ill., 479 F.3d 908, 918 (7th Cir. 2007).* Here, a reasonable jury could see the Command Review

Case: 20-1750     Document: 17     Filed: 09/21/2020     Pages: 90

findings as evidence while rejecting Rivera's finding of sustained a tissue of lies (the polite term is "pretext).    As proven that Plaintiff has never had a CR sustained (jury could reasonably disbelieve an employer's explanation for a decision inconsistent with the employer's prior conduct); *Vaughn v. Woodforest Bank, 665 F.3d 632, 638–40 (5th Cir.2011).*

## Progressive Discipline

The initial complaint by Higgins "failed to respond to burglary in progress" was a serious charge that can lead to being extensively suspended up to being fired.  The highest discipline penalty an officer can receive is a CR.  Thus the CR proves pretext, malicious and violation to progressive discipline; as the allegation should have never been a CR but a simple reprimand, verbal warning or a summary punishment action request (SPAR) that would have never been placed on Plaintiff's permanent record. (Docket 103-3 p.71-72 & 80 -92).   After Plaintiff submitted memorandum that she did respond to the burglary in progress and indeed the allegation was a lie; the allegation was changed to a lesser charge "failed to properly respond." After IAD investigator Kane could not find nothing "improper" committed by Plaintiff: years later the charge was changed to "failed to timely respond."  This continuous change of the allegation shows the Defendant failed to follow progressive discipline, including verbal warnings, written warnings, and finally, suspension. *Joseph M. Conley v. Village of Bedford Park, 215 F.3d 703 (7th Cir. 2000).*  Defendant gave false assumption that it applied progressive discipline against plaintiff; whereas Plaintiff has never had a CR sustained.  It is in violation to suspend an Officer when an officer has no previous sustained infractions, as discipline supposed to be progressive.  The Defendant tries to argue that the suspension was not adverse because the suspension was reversed (7) seven years later.  However, there is no dispute that a suspension

constitutes an adverse employment action. *Biolchini v. General Electric Co., 167 F.3d 1151, 1154 (7th Cir.1999).*

According to the legal advocate, a Summary Punishment Action Request (SPAR), as defined in General Order 93-03-07, an alternative to a CR for conduct defined as a less serious transgression which is observed by, or comes to the attention of a Department supervisor or command member. (Docket 90-5 p.59 ¶11-18). Supervisors should exercise good judgment in the application of summary punishment. The option to issue a SPAR should not be construed to diminish a supervisor's discretion to utilize other options when warranted, such as admonishment, counseling, or training. (Docket 103-3 p.71-72 &81-85 & 92). Here, material evidence is provided that Higgins intent was malicious and aggressive in that Higgins had the option to simply admonish or counsel Plaintiff and White instead of damaging their career with such egregious allegation that is now permanent on their record. *Watkins v. McCarthy, 2012 IL App (1st) 100632).* Though, Plaintiff and White were not in violation of any infraction despite of Higgins biased creation of the CR. Discipline is supposed to be progressive, yet Higgins went to the extreme against the discipline matrix. If Plaintiff was in violation of any wrongdoing; Higgins had supposed to counseled Plaintiff and White instead of defaming their reputations by a permanent CR record accessible and FOIA to the public. (Docket 103-3 p.71-98).

## Disparate Treatment

Title VII prohibits employers from treating applicants or employees differently because of their membership in a protected class. The central issue is whether the employer's action was motivated by discriminatory intent, which may be proved by either direct or circumstantial evidence. The power of "stray remarks" was given some new life after the Supreme Court ruled in *Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133 (2000),* that a lower court of appeals erred

Case: 20-1750      Document: 17      Filed: 09/21/2020      Pages: 90

by discounting evidence of the decision maker's age-related comments ("you must have come over on the Mayflower") merely because not made "in the direct context of termination." Where a committee is ostensibly the decision maker, a bigoted supervisor's stray remarks can be imputed to the committee if the committee is simply a rubber stamp. *Mateu-Anderegg, v. Sch. District of Whitefish Bay, 304 F.3d 618 (7th Cir. 2002).* Sergeant Higgins was heard with "stray remarks" by Plaintiff and White saying several racist and discriminatory remarks over the radio including referring to criminals as cousins to the Black officers, assuming Black Officers were lazy and always sleeping by saying "wake up and go to the job."(Docket 90-4 p.18-22, 27 & 44) & Docket 90-5 p.18 ¶1-3). Higgins was heard on several occasions stating many race and sex biased "stray remarks" over the radio such as "we got a don't shoot my mama daddy drama mission, they want to grow up in the zoo" and "stop these people from killing each other at the zoo." The mission location that Higgins were referring is an all-Black low-income high crime community. (Docket 90-5 p.20-22 & 98). Employer's stated reason is a pretext to hide discrimination. *McDonnell Douglas, 411 U. S. at 802-04; Burdine, 450 U.S. at 252-56.*

## Systemic Racism

Plaintiff's plight to justice revealed systemic racism. The Command Review consisting of three high ranking Black supervisors Dana Alexander, Eugene Williams, and Al Wysinger all classified the CR as false/unsustained. The former Chief of Internal Affairs shielded Sergeant Higgins from accountability of discrimination. IAD investigator Kane also shielded and covered up for Sergeant Higgins. Plaintiff complained of discrimination to her union (Fraternal Order of Police Lodge 7) and her union also turned a blind eye and allowed the CR to sit open for years on her record and only finally defended Plaintiff in December 2015 when the arbitrator finally ruled the CR was false but failed to hold Kane, Higgins and Rivera accountable for

discrimination and retaliation; as all three retired in good standing without no repercussions. Plaintiff's union and Defendant failed to ensure that the CR be Unfounded/Expunged from Plaintiff's record. Rivera even mailed Higgins a "thank you letter" in 2014 for obtaining the CR against Plaintiff. (Docket 103-2 p.16). Systemic racism was further perpetuated on the State level in 2008 when IDHR refused to take Plaintiff's discrimination charge and told Plaintiff to return upon suspension. (Docket 90-16 p.2-9). Plaintiff returned to IDHR in 2014 after being suspended and IDHR took Defendant's word and avoided Plaintiff's facts and evidence that she did indeed responded to the burglary in progress and did not violate any rule or directive. EEOC later informed Plaintiff that because her suspension was reversed in 2015 that EEOC will not seek any penalties against Defendant but will mail the right to sue letter on grounds of the lack of timeliness to investigate the CR. Plaintiff is still enduring systemic racism as the defendant is demanding Bill of Cost due to the fact Defendant won summary judgment. Plaintiff pleads the court to remand this case to trial to put Systemic Racism on notice that it will no longer be tolerated and "when we see something wrong, speak up and out." Thus, speaking out about discrimination in the workplace can have a meaningful and lasting impact. Now, is a particularly good time to take a close look at the Defendant's policies prohibiting harassment and discrimination. The Chicago Police Department need to develop discrimination and harassment training that include a module on bystander intervention to stop such conduct. It is time for dismantling CPD internal affairs, rebuild and reform. Ultimately, Defendant had a duty to eliminate discrimination in the workplace, including the duty to identify and investigate but failed.

Defendant continuously provided several false reasons for the adverse action (suspension); such as failed to respond, improper response, untimely response, and progressive discipline. A

plaintiff who proves a prohibited factor motivated the adverse action need not rebut all asserted reasons). However, there may be circumstances where "multiple grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Fischer, 519 F.3d at 404* (quoting *Russell v. Acme-Evans Co., 51 F.3d 64, 69-70 (7th Cir.1995)*. At summary judgement plaintiff need only raise a material issue of fact as to the believability of the employer's justification. Plaintiff need not also provide evidence of discriminatory motive. *Rudin v. Lincoln Land Cmty. Coll.,420 F.3d 712 (7th Cir. 2005)*. The plaintiff is not required to prove psychological harm or tangible effects on job performance. *Harris v. Forklift Sys., 510 U.S. 17 (1993)*. A supervisor has the authority to hire, fire, demote, promote, transfer, or discipline an employee. *Valentine v. City of Chicago,452 F.3d 670 (7th Cir. 2006)*. The employer's response to reported harassment must be reasonably calculated to prevent future harassment. *Jackson v. County of Racine, 474 F.3d 493 (7th Cir.2007)*. An employer has taken adequate remedial measures where it conducts a prompt investigation into the harassment complaint, reprimands the harasser, produces a letter of apology, and separates the victim from the harasser. *Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044 (7th Cir. 2000)*. plaintiff who claims emotional distress damages will likely be required to turn over psychiatric records. *Doe v. Oberweis, 456 F.3d 704 (7th Cir. 2006)*.

Plaintiff has raised a genuine issue of material fact with respect to *prima facie* case and retaliation and pretext on her Title VII retaliation claim. To demonstrate a prima facie case of retaliation, each Plaintiff must show: 1) she engaged in statutorily protected activity; 2) she suffered adverse employment actions; and 3) a causal link existed between the protected activity and the adverse action.

In light of the murder of George Floyd; plaintiff lawsuit is being heard under a tone of racial awareness and inequities but Plaintiff feel compelled to inform Society that not all cops are corrupt, not all whites are racist and not all Blacks are criminal or fit the negative stereotypes. In the effort to not perpetuate racial division and further tension against Law Enforcement; Plaintiff want it to be known that a high ranking Male White Supervisor allotted Plaintiff a grand opportunity to utilize her education, experience, and skills when no one else gave Plaintiff an opportunity. Plaintiff-Appellant finally receiving a fair opportunity from a Non-biased Male White Supervisor that looked at Appellant based on her true merit, resume, experience, qualifications and character therefore granting Appellant a lateral opportunity to teach Crisis Intervention/ De-escalation skills at the Chicago Police Training Academy in April 2017. Society must come to understand all this chaos, violence and civil unrest comes from evil trying to divide and wreak havoc. Society must acknowledge that we all hold biases, but we must all "check our biases at the door before we speak and react." Higgins failed to check his biases before acting and participated in discriminatory practices, causing Plaintiff emotional, financial, reputation and career harm.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Honorable Court reverse the District Court's summary judgment on all counts, and remand for further proceedings.

Jacqueline A. Watkins
Pro se Plaintiff-Appellant
1727 W. 107th Street
Chicago, IL 60643
By: /s/ Jacqueline Watkins
     Jacqueline Watkins

# CERTIFICATE OF COMPLIANCE WITH
## FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c)

The undersigned, Pro se Plaintiff-Appellant, Jacqueline Watkins, furnishes the following in compliance with F.R.A.P Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a 12-point Times New Roman Font. The length of this brief is 13,945 words.

Dated: September 19, 2020

Jacqueline A. Watkins
Pro se Plaintiff-Appellant
1727 W. 107th Street
Chicago, IL 60643
(773) 562-0167

By: /s/ Jacqueline Watkins
Jacqueline Watkins

## IN THE UNITED STATES COURT OF APPEAL
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| Jacqueline Watkins, | ) | Appeal from the United States |
| | ) | District Court, Northern District of |
| Plaintiff-Appellant, | ) | Illinois, Eastern Division |
| | ) | |
| v. | ) | No. 17-cv-02028 |
| | ) | |
| City of Chicago, | ) | The Honorable, |
| | ) | **Edmond E. Chang,** |
| Defendant-Appellee. | ) | Judge Presiding |

## NOTICE OF FILING AND CERTIFICATE OF SERVICE

To:   MYRIAM ZRECZNY KASPER / SCOTT CROUCH via CM/ECF
City of Chicago, Law Department Employment Litigation Division
30 North LaSalle Street - Suite 800
Chicago, IL 60602

PLEASE TAKE NOTICE THAT on September 19, 2020, I filed with the Clerk of the United States Court of Appeals for the Seventh Circuit, Appellant's opening brief.

### **Proof of Service**

I, JACQUELINE WATKINS, Plaintiff-Appellant Pro se, hereby certifies that copies of this Notice of Filing and Certificate of Service were served upon the attorneys named above at the addresses given above, *via* electronic delivery on September 19, 2020.

JACQUELINE WATKINS
Plaintiff-Appellant, Pro se
By  /s/ Jacqueline Watkins

Pro se/ Jacqueline A. Watkins
1727 West 107th Street
Chicago, Illinois 60643
(773) 562-0167/ Jacquelinegl@comcast.net

Case: 20-1750   Document: 17   Filed: 09/21/2020   Pages: 90

SHORT APPENDIX

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

JACQUELINE WATKINS,,

Plaintiff(s),

v.

CITY OF CHICAGO,

Defendant(s).

Case No.  17 C 2028
Judge Edmond E. Chang

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐  in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

_____

☐  in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

_____

☒  other: Summary judgment granted in favor of Defendant and against Plaintiff. Case dismissed with prejudice.

_____

This action was *(check one)*:

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☒ decided by Judge Edmond E. Chang on a motion for summary judgment.

Date:  3/26/2020

Thomas G. Bruton, Clerk of Court

/s/ Michael Wing, Deputy Clerk

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-02028 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Jacqueline Watkins is a Chicago Police Officer who brings this Title VII employment discrimination case, 42 U.S.C. § 2000e *et seq.*, against the City of Chicago.[1] R. 18, Am. Compl.[2] According to Watkins, the Chicago Police Department discriminated against her on the basis of race and gender and then retaliated against her when she complained about the discrimination. The City has moved for summary judgment. R. 89. For the reasons explained below, the motion is granted.

## I. Background

The facts narrated below are undisputed unless otherwise noted (and if disputed, the evidence is viewed in Watkins's favor).[3] Jacqueline Watkins has been

---

[1] The Court has federal question jurisdiction over this case under 28 U.S.C. § 1331.

[2] Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

[3] Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the City's Statement of Facts [R. 90] and "Pl.'s Resp. DSOF" for Watkins's response to the City's Statement of Facts [R. 103]. As the City points out, though, Watkins did not file a separate Statement of Additional Facts with her response to the motion for summary judgment. Instead, Watkins appears to have interspersed her new facts into her response to the City's Statement of Facts. In addition, Watkins's response to the DSOF contains numerous facts not supported by any record citation.

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

employed by the Chicago Police Department as a Police Officer since 1999. DSOF ¶ 1. Officer Watkins is an African-American woman. *Id.*

## A. Complaint Registers

In September 2008, Watkins was on patrol with her partner, Officer Harriet White, who is also an African-American woman. DSOF ¶ 5. Watkins and White were part of the third-watch shift in the CPD's 22nd District. *Id.* The third watch was staffed by around ten officers, including Watkins and White, and was supervised by Sergeant Francis Higgins. *Id.* ¶ 6.

The third-watch patrol ran from 4 p.m. to midnight. DSOF ¶ 5. At around 11:25 p.m. on September 9, 2008, Watkins and White had just finished up a suspicious-person call and reported to dispatch that they were "clear." *Id.* ¶ 7. A report of "clear" means that the officers are available to respond to new calls. *Id.* ¶ 8. If an officer is not available to respond to calls for whatever reason, then the officer is supposed to report that they are unavailable. *Id.*

---

Federal courts may enforce their local rules, such as Local Rule 56.1, even as to *pro se* litigants like Watkins. *See e.g.*, *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Greer v. Board of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001). To be sure, the Court still views Watkins's *pro se* filings as expansively as reasonably possible, and she still gets the benefit of viewing the evidence in the light favorable to her. But to the extent that Watkins has alleged facts without any evidentiary support (whether explicitly cited or readily located in the record by the Court), the Court cannot credit them for purposes of this motion.

As for Watkins's additional facts, even though Defendants are correct in that she failed to file a separate statement of additional facts, the Court will nonetheless construe any *supported* facts that she includes in her response to the DSOF as one of her additional facts. The City helpfully picked out Watkins's new facts and placed them in a separate document (along with the City's responses), so the Court will go ahead and construe that document as "Def.'s Resp. PSOF," for the City's response to Watkins's Statement of Additional Facts [R. 109].

That night, White was driving; Watkins was in the passenger seat. DSOF ¶ 5. At 11:35, ten minutes after Watkins and White had reported themselves "clear," dispatch sent out a priority one call for a burglary in progress. *Id.* ¶ 10.

What happened next is disputed. According to the City, "priority one" means that the call is urgent, and *all* available officers must respond immediately. DSOF ¶ 11. As Sergeant Higgins was en route to respond to the burglary-in-progress call, he saw Watkins and White driving in the opposite direction from the burglary scene. *Id.* ¶ 12. At that point, Higgins called dispatch to report Watkins and White. *Id.* ¶ 13. Specifically, at 11:36 p.m. (one minute after the burglary call was made), Higgins placed a call to dispatch in which he asked dispatch to order Watkins and White to "turn around and head with me to that burglary in progress." *Id.* Accordingly, the dispatcher called Watkins and White; there was a pause with no reponse; and the dispatcher asked them if they copied. *Id.* Higgins eventually arrived at the scene of the burglary. *Id.* ¶ 14. Four minutes later, Watkins and White showed up. *Id.*

Watkins tells a different story. According to Watkins, the 11:35 p.m. burglary-in-progress call did not require all available officers to respond immediately. R. 100, Pl.'s Resp. DSOF ¶ 10. Rather, dispatch specifically assigned the call to a different beat car, not to Watkins and White. *Id.* As a result, Watkins disputes that she was required to immediately respond to the call. *Id.* Nonetheless, Watkins does not dispute that Higgins placed a call to dispatch to ask dispatch to instruct Watkins and White to respond to the burglary call. *Id.* ¶ 11. According to Watkins, Higgins was merely singling them out "in a hostile tone." *Id.* Even so, when dispatch relayed

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

Higgins's orders to Watkins and White, Watkins asserts that they immediately responded to the assignment at that point. *Id.* ¶¶ 11-12. Watkins does not dispute that when she and White arrived at the scene of the burglary, Higgins was already there. *Id.* ¶ 14. But Watkins asserts that it only took them "a few seconds, a minute or less," to show up, not four minutes. *Id.* In short, Watkins maintains that they did not immediately respond to the burglary-in-progress call because it had been assigned to a different beat car, but when dispatch later assigned the call to Watkins and White, they immediately responded. The bottom line, according to Watkins, is that she and White did not break any rules that night.

In any event, it is undisputed that a few hours after this incident, Sergeant Higgins filed what is called a "complaint register" (CR) against Watkins and White. DSOF ¶ 15; R. 90, DSOF, Exh. 10, Rivera Decl., Exh. C, Investigation Records at DEF-WAT 000493.[4] To provide some background, a CR is the first step in initiating potential discipline against a police officer. DSOF ¶ 30. A member of the public can file a CR against a CPD employee, or, as in this case, a CPD employee can file a CR against a fellow employee. *Id.* ¶ 31. When a CR is filed, as pertinent here, it is handled by the Internal Affairs Department (IAD); IAD assigns each CR a log number and

---

[4]The investigation records for both Higgins's CR against Watkins and Watkins's discrimination allegations against Higgins are provided as Exhibit C to Sergeant Juan Rivera's Declaration, which is in turn attached as Exhibit 10 to the DSOF. The investigation records encompass the original complaints written by Higgins and Watkins; the dispatch phone records from September 9, 2008; Sergeant Kane's interview transcripts with Higgins, Watkins, and White; Sergeant Kane's summary report; and other relevant letters and documents. The individual documents are not broken down into their own exhibits. So, for the sake of simplicity, from here on out, the Opinion will simply cite all of these documents as "Investigation Records" and will identify the specific page or pages by the "DEF-WAT" Bates number provided by the parties.

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

then assigns a staff member to investigate the allegations in the CR, create a summary of findings, and recommend discipline (if appropriate). *Id.* ¶ 32. IAD can issue one of four possible findings for a CR: (1) sustained, which means there was sufficient evidence to support the allegation of misconduct; (2) not-sustained, which means there was not sufficient evidence to support the allegation; (3) unfounded, which means the alleged misconduct did not occur; and (4) exonerated, which means the alleged conduct did occur but was actually not a rule violation. *Id.* ¶ 33.

Here, Higgins initiated the CR process by filing an internal memorandum in which he detailed how Watkins and White, "in spite of ample time and space to make a U-turn," drove "AWAY from an all call assignment." DSOF ¶ 15; Investigation Records at DEF-WAT 000493 (capitalization in original). Higgins did not dispute Watkins's assertion that the burglary call was initially assigned to a different beat. *See* Investigation Records at DEF-WAT 000493. But Higgins maintained that Watkins and White were still supposed to respond, because the call was an "all call assignment," which presumably means that even though it had been specifically assigned to a beat car, all other available units were still expected to respond. *Id.* At the top of the memorandum, Higgins characterized his allegations as "inattention to duty" and "failure to provide police service." *Id.* It is undisputed that other than this CR against Watkins and White, Higgins never issued any other CRs over the course of his 29-year career. DSOF ¶ 18.

On September 25, 2008, Sergeant Derrick Shinn (also of the 22nd District) notified Watkins that a CR had been opened against her. Pl.'s Resp. DSOF ¶ 17;

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

Investigation Records at DEF-WAT 000511-12. As mentioned above, Watkins sharply disagreed with the factual basis for the CR (namely, that she failed to respond to a burglary call). So, a week later, on October 2, 2008, Watkins wrote her own internal memorandum alleging that Higgins made a false report against her simply because she was a Black woman. DSOF ¶ 21; Investigation Records at DEF-WAT 000489-90. In her memorandum, Watkins alleged that Higgins was motivated by "his own inward racial hatred and prejudice" to "make a false allegation without fact or justification." Investigation Records at DEF-WAT 000490. She called his filing of the CR as an "outward act of discrimination" against herself and White. *Id.*

## B. First IDHR Charge

Around the same time that she filed the memorandum internally with the department, Watkins also attempted to file a charge of discrimination with the Illinois Department of Human Rights (commonly referred to as "IDHR"). DSOF ¶ 68. She filled out an IDHR Employment Complainant Information Sheet, on which she stated that the CPD discriminated against her on the basis of race and gender when Higgins initiated the allegedly false CR against her. *See* R. 90, DSOF, Exh. 15. But according to Watkins, before she could officially file the charge, an IDHR representative named Maryann Pettway told her that "unless there was some punishment or other employment detriment that ensued as a result of this action, the complaint could not be filed and investigated." DSOF ¶ 69; Pl.'s Resp. DSOF ¶ 69. As a result, Watkins did not file the IDHR charge. DSOF ¶ 69.

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

### C. Internal Review of Complaints

Meanwhile, the CPD's internal review process for the two complaints—the inattention to duty CR that Higgins filed against Watkins, and the discrimination CR that Watkins filed against Higgins—was just getting started. This process would ultimately go through multiple layers of review and would last six years.

The first person to review the complaints was Sergeant Derrick Shinn. (Shinn was just another member of the 22nd District and was not a member of IAD.) The record shows that Sergeant Shinn was first assigned the case on September 16, 2008. *See* Investigation Records at DEF-WAT-000487. (This was before Watkins accused Higgins of discrimination.) On that date, a "complaint log number" of 1019842 was assigned to Higgins's CR against Watkins. *Id.* at DEF-WAT 000494. Then, on October 2, Shinn received Watkins's complaint of discrimination against Higgins. *Id.* As far as the record shows, Watkins's complaint was not assigned a separate log number. Rather, it appears to have been consolidated with Higgins's existing log number, although Watkins maintains that this shows the City never bothered to assign her CR its own number. Pl.'s Resp. DSOF ¶ 34. A week later, on October 10, Sergeant Shinn noted that he ultimately "found no evidence during [his] investigation to support this allegation against Sgt. Higgins." Investigation Records at DEF-WAT 000487. On that same day, Shinn transferred the entire case number (encompassing both the allegations against Watkins and the allegations against Higgins) to IAD, because IAD was responsible for investigating all discrimination allegations. *Id.*

Pages: 90          Filed: 09/21/2020          Document: 17          Case: 20-1750

When CR No. 1019842 reached IAD in November 2008, it was assigned to Sergeant Jamie Kane for review. DSOF ¶ 34; Investigation Records at DEF-WAT 000485. This meant that Kane would be responsible for investigating both the inattention to duty allegations as well as the discrimination allegations. DSOF ¶ 34. It is undisputed that as part of this investigation, Kane interviewed Higgins, Watkins, and White and also reviewed the dispatch audio recordings from September 9, 2008 (the night of the burglary call) and other documents from that night. *Id.*

Specifically, Kane conducted two interviews with Watkins on April 28, 2010. Investigation Records at DEF-WAT 000528-31, DEF-WAT 000534-37. It is unclear why these interviews took place nearly a year and a half after the complaints were assigned to Sergeant Kane. During the first interview, Kane asked Watkins about the September 9, 2008 burglary-in-progress call. *Id.* at DEF-WAT 000528-31. Watkins explained that when she and White heard the original dispatch for the burglary call, they made a U-turn to drive toward the job. *Id.* at DEF-WAT 000530. But apparently they did not turn fast enough for Sergeant Higgins, who "went over the air in a nasty tone, to tell [Watkins and White] to turn around." *Id.*

The second interview that afternoon focused more on Watkins's discrimination allegations against Higgins. According to Watkins, Higgins could have easily addressed any issues he had with her on the scene of the burglary. Investigation Records at DEF-WAT 000535. Instead, he went "to the extreme level of obtaining the slanderous CR number and automatically going into the [stereotype] of black female officer, of assuming lazy, inefficient, and trying to avoid work." *Id.* Watkins also

8

mentioned that she observed that when a white officer had an issue, Higgins would simply discuss it with them as opposed to filing a CR. *Id*. She could not point to any specific white officers, but remarked that Higgins was generally "friends with all of the white officers." *Id*. at DEF-WAT 000536. Watkins also mentioned that she heard from two other Black female officers, one named Sheila Fulks and the other named Linda (the last name was not identified), that Sergeant Higgins had also disciplined them in more extreme ways: for Fulks, Higgins had allegedly put his hand on her back, pushed her, and told her to get to roll call once when she was late, and for Linda, he spoke to her supervisor when she was late to an assignment. *Id*. Watkins also accused Higgins of making racist remarks generally. For instance, according to Watkins, when they were dealing with Black suspects, Higgins would tell the Black officers to "get your cousins." *Id*. Higgins would also apparently say "wake up" whenever he tried to communicate to officers (though it is not clear if this was to all officers or just Black officers). *Id*.

Watkins later asserted that the transcripts do not capture the entire interview exchange. Most notably, Watkins claims that during one of her interviews with Kane, she accused Sergeant Higgins of being a racist, and in response, Kane "was like you're defaming his reputation." R. 90, DSOF, Exh. 3, Watkins Dep. Tr. at 92:14-18.[5]

---

[5]Watkins describes this encounter in much stronger language in her response brief. Specifically, Watkins asserts that Kane actually "yelled" at her and stated "how dare you ruin this man reputation with this discrimination allegation." Pl.'s Resp. Br. at 3. But that statement in the response brief is not accompanied by any record cite. The only place in the record that seems to support this fact is Watkins's deposition transcript cited above. *See* R. 90, Exh. 3, Watkins Dep. Tr. at 92:14-18. But because the deposition transcript does not support either the allegation that Kane "yelled" at Watkins, or the allegation that Kane said

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

After the two interviews with Watkins on April 28, 2010, Kane then interviewed Sergeant Higgins that same afternoon. Investigation Records at DEF-WAT 000519-21. Higgins largely reiterated the allegations in his original complaint register, and further noted that he did not remember if he spoke to Watkins and White at the scene of the burglary because he "was busy." *Id.* at DEF-WAT 000521. The next month, in May 2010, Kane also interviewed White. *Id.* at DEF-WAT 000538-41, DEF-WAT 000545-46. White mostly corroborated Watkins's version of events from the night of the burglary call. White remembered hearing the dispatcher issuing the burglary call, then calling out their beat, and then Watkins and White made a U-turn and drove toward the assignment. *Id.* at DEF-WAT 000540. According to White, it took them less than 30 seconds to arrive at the call. *Id.* at DEF-WAT 000541.

In November 2010, Sergeant Higgins retired from the Department. DSOF ¶ 6. According to Watkins, he was "allowed to retire in good standing" despite her pending discrimination claims against him. Pl.'s Resp. DSOF ¶ 17.

Finally, in October 2011, Sergeant Kane produced an eight-page summary report of her findings. Investigation Records at DEF-WAT 000471-79. In the summary report, Kane laid out the arguments made by Higgins, Watkins, and White and then Kane described what she heard on the audio recording of the pertinent dispatch calls. Specifically, Kane determined that, based on her impression of the audio recording, the sequence of events happened like this: (1) at 11:35 p.m., the dispatcher announced the burglary-in-progress call and assigned it to a different beat

---

the words "how dare you ruin this man['s] reputation," the Court cannot accept those allegations just from the response brief.

car, and that beat responded with "10-4"; (2) at 11:36:20, Higgins came on air and told the dispatcher to "tell [Watkins and White] to turn around and head with me to the burglary in progress"; (3) the dispatcher called Watkins and White; (4) there was a pause with no response; (5) the dispatcher asked "do you copy"; (6) Watkins and White responded. *Id.* at DEF-WAT 000474-75. Based on those findings, Kane ultimately "sustained" the allegations against both Watkins and White (which means she found sufficient evidentiary support for them), and then recommended a two-day suspension for Watkins and a one-day suspension for White. *Id.* at DEF-WAT 000479. Kane was not persuaded by the discrimination allegations against Higgins. *Id.* at DEF-WAT 000477.

The next step in the review process was to send Kane's summary report up the chain of command. Under this "Command Channel Review" process, Kane's findings would be reviewed by various CPD supervisors, who would each issue their own recommendations. R. 90, DSOF, Exh. 10, Rivera Decl. ¶¶ 13-14. Afterwards, the case would then make its way up to the IAD Chief, who at the time was Sergeant Juan Rivera, and finally the CPD Superintendent, Garry McCarthy. DSOF ¶¶ 37-38. Superintendent McCarthy would ultimately have the authority to decide whether or not to adopt the investigatory findings and to issue discipline if applicable. Rivera Decl. ¶ 15.

In this instance, the Command Review process began with Dana Alexander, Eugene Williams, and Al Wysinger. Pl.'s Resp. DSOF ¶ 13. It is undisputed that the three Command Reviewers disagreed with Kane's findings on the burglary call and

opined instead that they believed Watkins and White were not officially assigned to the initial call (at 11:35 p.m.) until the dispatcher specifically called out their beat number (at 11:36 p.m.). Rivera Decl. ¶ 21. At the first Command Review step, in February 2012, Alexander recommended changing the finding from "sustained" to "not sustained." Investigation Records at DEF-WAT 000462-63. Alexander noted that there was no evidence showing when Watkins and White actually arrived on the burglary scene, but contrary to Kane's findings, Alexander never heard a "delay in response" by Watkins and White. *Id.* Then, in June 2012, at the next review step, Eugene Williams simply adopted Alexander's findings and also recommended changing the CR to "not sustained." *Id.* at DEF-WAT 000461. And finally, in June 2012, Wysinger also recommended a "not sustained" finding. Wysinger also noted that there was no actual evidence of what time Watkins and White arrived on the scene and pointed out that "the officers are in error by stating that the dispatcher assigned them to respond to the burglary in progress." *Id.* Ultimately, however, because Wysinger concluded that they did eventually respond, he recommended not sustaining the CR. *Id.*

In June 2012, the case reached IAD Chief Juan Rivera. (Rivera would be the final layer of review before the case went up to Superintendent McCarthy.) According to Rivera, he looked at the original CRs, the printout of the dispatch audio records, Kane's summary report, and the Command Review findings. Rivera Decl. ¶ 22. It is unclear if Rivera himself listened to the actual audio recording of the dispatch call. Rivera acknowledged that three of the Command Reviewers had disagreed with the

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

initial "sustained" recommendation, but based on his own review, he ultimately agreed with Kane's findings. *Id.* ¶¶ 21-22. Specifically, Rivera noted that whereas the Command Reviewers did not believe Watkins and White had been assigned the call until the dispatcher specifically called out their beat, Rivera himself believed that they should have responded immediately when the call went out at 11:35 p.m. *Id.* ¶ 22. Rivera ultimately recommended that Watkins be suspended for one day. DSOF ¶ 40; Rivera Decl. ¶ 25.

Finally, the case file went up to Superintendent Garry McCarthy for review. In February 2014, McCarthy accepted Rivera's recommendations, Rivera Decl. ¶ 30, and in March 2014, Watkins was officially suspended for one day, R. 103-2, Pl.'s Resp. DSOF, Exh. 1 at 13.

### D. Second IDHR Charge

After receiving the one-day suspension, Watkins again tried to file a charge of discrimination with the IDHR. This time she was successful. DSOF ¶ 70. In the 2014 IDHR charge, Watkins alleged that the one-day suspension was both discriminatory and retaliatory. *See* R. 18-1, Am. Compl., Exh. 1. The IDHR ultimately found in favor of the City, and the EEOC adopted the IDHR's finding. DSOF ¶ 71. Watkins received a notice of right to sue from the EEOC in December 2016 and filed this lawsuit on time. *Id.*

### E. Aftermath of Suspension

In addition to filing the charge of discrimination with the IDHR, Watkins also continued to fight the suspension through her union. DSOF ¶ 48. Finally, in

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

December 2015, an arbitrator ordered the City to change the CR finding against Watkins from "sustained" to "not sustained." *Id.* (Recall that "not sustained" means there was not sufficient evidence to support the allegation, but it does not go so far as to deem the conduct "unfounded" or "exonerated." *Id.* ¶ 33.) The arbitrator also ordered the City to compensate Watkins for the one-day suspension. *Id.* ¶ 48. The City complied with both orders. *Id.*

Despite the reversal of the suspension, Watkins asserts that the damage was done. For one, she alleges that both the CR and the suspension severely hampered her chances at promotion within the Department. DSOF ¶ 49. It is undisputed that out of the two methods for advancement—test scores and merit promotion—merit promotion was the only available avenue for Watkins. *Id.* ¶ 62. What that means is Watkins would have needed to secure a nomination from a commander as well as letters of recommendation from supervisors in order to be promoted. Pl.'s Resp. DSOF ¶¶ 63-64. According to Watkins, she submitted multiple applications for detective positions (as well as maybe sergeant positions), and she also reached out to several supervisors to ask for a recommendation and did not hear back. *See* Pl.'s Resp. Br. at 11, 18; Pl.'s Resp. DSOF ¶¶ 58, 67. Some of these instances definitely occurred in 2016 or later, while the timing of the others is unspecified. Pl.'s Resp. DSOF ¶¶ 58, 67. In addition, Watkins asserts that the process of dealing with the allegedly false CR and suspension caused her immense emotional distress. Watkins Dep. Tr. at 133:24, 134:1-2.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[6] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

### III. Analysis

Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). Title VII also bars employers from retaliating against employees who engage in protected activity under Title VII. *See Poullard v. McDonald*, 829 F.3d 844, 855-56 (7th Cir. 2016). Watkins claims that the City did both. Specifically, Watkins argues that the Chicago Police Department discriminated against her on the basis of her race and sex when Sergeant Higgins filed a false complaint register against her in 2008, and again when she received a suspension in 2014. Watkins also brings a retaliation claim based on that 2014 suspension. At the summary judgment stage, the Court views the evidence in the light most favorable to Watkins and gives her the benefit of all reasonable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For the reasons explained below, Watkins has failed to establish either a disparate-treatment claim or a retaliation claim.

### A. Disparate Treatment

To survive summary judgment on the disparate-treatment claim, Watkins must produce evidence that would allow a reasonable jury to find that the City's adverse employment actions against her were motivated by her race or sex. *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("The legal standard ... is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."). The Seventh Circuit has made clear that all

16

Pages: 90     Filed: 09/21/2020     Document: 17     Case: 20-1750

relevant evidence must simply be considered "as a whole." *Id.* at 763. As a practical matter, though, in this particular case there are two main avenues to establishing a disparate treatment claim.

The first option is for Watkins to try to establish a *prima facie* case for discrimination, which requires her to show that (1) she is a member of a protected class; (2) her job performance met the City's legitimate expectations; (3) she suffered an adverse employment action; and (4) the City treated another similarly situated employee who was not a member of the protected class more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *LaRiviere v. Bd. of Trs. of Southern Ill. Univ.*, 926 F.3d 356, 360 (7th Cir. 2019). If Watkins is able to establish a *prima facie* case, then the burden will shift to the City to provide a legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012). If the City successfully rebuts Watkins's *prima facie* case, then the burden will shift back to Watkins, "who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination." *Id.* (cleaned up). Alternatively, even if Watkins cannot establish a *prima facie* case, she can still succeed on this claim as long as she points to enough circumstantial evidence that would allow a reasonable jury to infer that a decision was attributable to discriminatory motivations. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

Here, Watkins points to two actions by the City that she alleges were discriminatory—the filing of the 2008 complaint register and the 2014 one-day suspension. The City has moved for summary judgment on both those decisions.

### 1. 2008 Complaint Register

Turning first to the 2008 complaint register (CR), the argument here is that Sergeant Higgins filed the CR against Watkins not because she did anything wrong, but rather because of her race and gender. In response, the City claims that the 2008 CR cannot be the basis of any Title VII claim because Watkins failed to file a timely charge of discrimination with the EEOC or IDHR, and even if the claim were timely, she has also failed to establish as a substantive matter that Higgins discriminated against her when he filed the CR.

### a. Timing of the Claim

As a threshold matter, the City argues that any claims stemming out of the 2008 CR should be barred because Watkins failed to file a timely charge with either the Equal Employment Opportunity Commission (EEOC) or the Illinois Department of Human Rights (IDHR). R. 91, Def.'s Br. at 6. Filing a timely charge of discrimination with either the EEOC or the state equivalent (in this case, the IDHR) is a prerequisite to bringing a Title VII claim. 42 U.S.C. § 2000e–5(e)(1); *Moore v. Vital Prods., Inc.,* 641 F.3d 253, 256 (7th Cir. 2011).

Here, it is undisputed that Watkins did not file a charge of discrimination on time. DSOF ¶ 69. Watkins explains that she tried to file an IDHR report right after the CR was initiated back in 2008, but an IDHR representative told her that she was

18

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

not allowed to because "unless there was some punishment or other employment detriment that ensued as a result of this action, the complaint could not be filed and investigated."[7] *Id.* ¶ 69; Pl.'s Resp. DSOF ¶ 69. As a result, Watkins waited until 2014, which is when the CR was finally resolved (as a suspension), to try again to file a charge of discrimination. DSOF ¶ 70. Unfortunately, the original IDHR representative's advice was incorrect. There is no rule requiring Watkins to wait for the CR against her to be formally resolved before she is allowed to file a charge alleging that the CR was discriminatorily lodged in the first place. (It is true that an adverse employment action is needed to ultimately win a substantive claim, but it does not appear that an IDHR representative has the authority to refuse to accept a charge.) So, the question is whether some sort of equitable tolling principle might apply to excuse Watson's six-year delay in filing her charge of discrimination due to the faulty advice of the IDHR representative.

Equitable tolling "is reserved for situations in which the claimant has made a good faith error (such as bringing suit in the wrong court) or has been prevented in some extraordinary way from filing his complaint in time." *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001). As it turns out, however, it is not necessary to resolve the factual issue of whether equitable tolling should apply to a scenario where an IDHR employee communicates an incorrect rule to a plaintiff,

---

[7]The City argues that this evidence should not be considered because it is hearsay. Def.'s Br. at 7. That is incorrect. The statement by the IDHR representative is not being offered for the truth of the matter asserted, but rather for its effect on Watkins.

thereby preventing the plaintiff from filing a charge on time.[8] As the Court will explain in more detail below, Watkins has failed to establish a substantive claim for disparate treatment on the 2008 CR. In other words, the Court takes no position on whether the fact pattern alleged here would have been enough to warrant equitable tolling because the claim must be dismissed either way.

### b. Merits of the Claim on the 2008 CR

As mentioned above, in order to establish a disparate-treatment claim based on the 2008 CR, Watkins must provide enough evidence that would allow a reasonable jury to infer that Higgins only initiated the CR because of Watkins's race or sex. *Ortiz*, 834 F.3d at 765. Here, looking at all of the evidence as a whole, there is simply not enough factual support for a reasonable jury to infer that Higgins filed the CR against Watkins because of her race or sex.

For one, Watkins has failed to satisfy the elements of a *prima facie* case of discrimination, to the extent that she relies on that method of proof. There is a dispute over whether the initiation of a CR counts as a material adverse employment action, as well as whether Watkins's actions on the night of September 9, 2008 satisfied the City's legitimate expectations. But even if the Court were to resolve those disputes in Watkins's favor, the *prima facie* case must fail because Watkins has failed to identify

---

[8]Another issue would have been whether the equitable tolling inquiry should be a bench or a jury question. If Watkins had successfully established a disparate-treatment claim based on the 2008 CR, the Court would have solicited position papers from both parties on the bench or jury question. But again, because the disparate treatment-claim will not survive, there is no need to resolve that issue at this point.

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

any similarly situated individuals outside of the protected classes who were treated better than her.

The Seventh Circuit has defined "similarly situated" to mean an individual who is directly comparable to the plaintiff in all important ways. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). To be sure, the other employee need *not* be identical to Watkins, nor is there a "mechanical magic formula"—rather, the inquiry is "flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (cleaned up). Some common features are "whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up).

In this case, the best evidence Watkins could have pointed to would have been a white male officer who similarly exhibited a one-minute (or longer) delay in responding to a burglary call (or even a crime of similar urgency). But Watkins does not identify any officer like that, nor does she really identify any comparable officers in general, even when the parameters for what counts as "similar" are loosened. Watkins did mention during her 2010 interview with Kane that she observed white men receiving more lenient treatment from Higgins. Investigation Records at DEF-WAT 000536. But Watkins could not identify who those men were, what they had

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

done wrong to receive more lenient discipline, or when her observations had happened. *Id.* Instead, Watkins's only conclusion was that there was no specific incident she was thinking of; Higgins just tended to be friends with all the white officers. *Id.* That alone is not enough to satisfy the similarly situated employee requirement for a *prima facie* case.

Nor is the data Watkins cites in her response brief enough to raise an inference of discriminatory intent on Higgins's part. Specifically, Watkins points to CR statistics she pulled from the Citizens Police Data Project website. Pl.'s Resp. Br. at 21-22. But even assuming these statistics are usable in her case, they do not appear to support her claim. Specifically, the statistics purport to illustrate the rate at which CRs were found to be "sustained" or "unsustained" for different racial and gender categories. Watkins argues that a greater percentage of CRs initiated against white men are ultimately "unsustained" compared to the CRs initiated against Black women, which suggests that Black women are disciplined more harshly than white men. *Id.* at 22. But this part of Watkins's disparate-treatment claim is really about the *initiation* of allegedly false CRs in the first place, not their resolution. And here, Watkins has not explained how the rate of sustained versus unsustained CRs speaks to whether those CRs were legitimately initiated in the first place. Nor does the data demonstrate that a greater absolute number of CRs were lodged against Black women compared to white men.[9] *Id.*

---

[9]For these reasons, Watkins's motion to file a sur-reply, R. 115, is also denied. Specifically, Watkins seeks to introduce two new exhibits: (1) another Citizens Police Data Project excerpt and (2) a 2015 letter from the Illinois Attorney General. But even under the more lenient guidelines applied to a *pro se* plaintiff, it would be too much to allow a sur-reply

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

Looking beyond the *prima facie* framework, Watkins's main argument in support of the 2008 CR being discriminatory is that Higgins harbored implicit biases toward Black women. Pl.'s Resp. Br. at 6. Specifically, Watkins asserts that the only reason Higgins filed the CR was because he believed the stereotype that Black women officers were "lazy, inefficient, and trying to avoid work." Investigation Records at DEF-WAT 000535. The problem is that Watkins does not point to any evidence that Higgins actually held this particular stereotype, or, more importantly, that he acted on that stereotype when he filed the CR. For instance, Watkins attributes words like "lazy" and "negligent" to Higgins throughout her filings, *see* Pl.'s Resp. DSOF ¶ 19, but there do not appear to be any actual citations to the record of Higgins saying those types of things, so the Court cannot credit these assertions.

Similarly, Watkins does offer evidence of other racially related remarks that Higgins made during his career, but there is no indication of when those remarks were made, nor is there any indication that those types of remarks were connected to Higgins's decision to initiate the CR for failure to respond to the burglary call. For instance, during the 2010 interview with Kane, Watkins claimed that when the officers were dealing with Black suspects Higgins would tell the Black officers to "get your cousins." Investigation Records at DEF-WAT 000536. Higgins also apparently said "wake up" on several occasions when he tried to communicate to officers over the radio, though, as mentioned above, it is not clear if this comment was directed only at Black officers. *Id.* The "cousins" comment is especially troubling, but there does

---

based on data that was not identified during discovery and, in any event, is not relevant to the similarly situated individual point, as described above.

Pages: 90          Filed: 09/21/2020          Document: 17          Case: 20-1750

not really seem to be a direct connection between Higgins implying that all Black officers are related to Black criminal defendants, on the one hand, and Higgins's alleged perception that Watkins and White were slow to respond to a burglary call, on the other. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (stray remark might provide inference of discrimination when made in reference to the adverse employment action). Similarly, without knowing when the "wake up" comments were made or who they were directed to, it is difficult to link those words with Higgin's 2008 decision to file a CR. *See Perry v. Dep't of Human Servs.*, 793 F. App'x 440, 442 (7th Cir. 2020) (non-precedential disposition) (stray remark might provide inference of discrimination when made around the same time as the adverse action).

Moreover, even accepting as true Watkins's allegations about the night of the burglary call, it is still undisputed that for at least a short while, Watkins and White were driving in the opposite direction of the assignment; the disagreement is about how long it took for them to turn around. So it was not completely baseless for Higgins to interpret the situation as Watkins and White driving away from the scene of the call and to then place the call to dispatch. Perhaps Higgins was impatient (maybe even unreasonably so), but there is no evidence that he would have been more patient had Watkins not been a Black woman. In other words, the fact that he angrily called in to dispatch does not on its own suggest discriminatory animus.

As for the decision to file the CR itself, the record shows that Higgins sent in his memorandum one day (at the most) after the incident. Investigation Records at

Pages: 90          Filed: 09/21/2020          Document: 17          Case: 20-1750

DEF-WAT 000493. Watkins asserts that he should have talked to them at the scene of the burglary or conducted an investigation first instead of jumping straight to the drastic measure of filing a CR; the fact that he did take such a drastic measure, argues Watkins, is evidence of discrimination. Pl.'s Resp. Br. at 12. But again, this decision standing alone does not give rise to a reasonable inference of race or sex discrimination. After all, it is undisputed that Higgins never filed any other CRs before or after this incident, and it is also undisputed that Higgins supervised at least five other Black officers on the night in question. DSOF ¶ 18. The fact that Higgins did not subject other Black officers to negative treatment of course does not insulate Higgins from liability if he discriminated against Watkins. But in this particular case, it does not help support Watkins's case.

All in all, the Court is sympathetic to Watkins's perception of implicit bias on the part of Higgins, and the Court recognizes the difficulty of proving that a particular action was motivated by racism or sexism, where the decision-maker might not have even been actively thinking about race or sex, yet was still unconsciously driven by racist or sexist stereotypes. This is not to say that implicit bias can never be the basis for a Title VII claim. But in this particular case, Watkins has failed to offer enough concrete evidence to establish a causal connection between Higgins's alleged discriminatory attitudes toward Black women and his 2008 decision to initiate a CR against Watkins. Thus, the disparate-treatment claim based on the 2008 CR must be dismissed.

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

### 2. 2014 Suspension

Similarly, Watkins has failed to produce enough evidence to establish that the one-day suspension she received in 2014 was motivated by her race or sex. Just like above, she has failed to make out a *prima facie* case of discrimination, in large part because she has failed to identify any similarly situated individuals who were treated better than her (for instance, someone who did not receive a suspension despite being accused of similar conduct).

The City has also offered evidence that the 2014 suspension, which was reversed by the arbitrator in 2015, did not materially affect Watkins's chances at being promoted to detective. (To be clear, the issue here is whether the *suspension*, not the presence of the pending CR, affected Watkins's chances at promotion.) So, the question is whether Watkins has pointed to any evidence that, in the time span between when she received the suspension in 2014 and when it was removed from her record in 2015, she applied for a position and was denied because of the meritless suspension. And unfortunately, the record does not show that Watkins applied to any jobs between 2014 and 2015 that would have been affected by the suspension. Some of the applications she points to were definitively *after* the suspension had been removed, while she does not specify the timing of the other applications. *See* Pl.'s Resp. Br. at 11, 18; Pl.'s Resp. DSOF ¶¶ 58, 67.

But the even bigger problem with the 2014 suspension is that any potential discriminatory motive on the part of Higgins was insulated by multiple layers of independent review by other CPD supervisors—including the superintendent. Also,

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

unlike with the decision to file a CR itself, there is no evidence that Sergeant Higgins had anything to do with the decision to suspend Watkins, especially considering the undisputed fact that he retired from the department in 2010. In fact, the recommendation to suspend Watkins originated with Sergeant Kane, the IAD reviewer. And while, as discussed below, Watkins has provided ample evidence that Kane may have been motivated by *retaliatory* feelings, Watkins has not provided any evidence that Kane, Rivera, and McCarthy harbored discriminatory feelings toward Black women. For instance, Watkins does not point to any statements made by any of those decision-makers that would support an inference of race or sex discrimination.

Nor does Watkins try to argue that McCarthy, Rivera, *and* Kane were somehow influenced by Higgins's alleged biases. This is also known as the cat's paw theory of liability and will be discussed in more depth in the next section. But for now, suffice to say that "the cat's paw theory requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013). Here, even if Watkins had raised that argument, it would have been unsuccessful, because there is no evidence that Higgins was so influential throughout the multiple layers of review (especially after he retired in 2010), including all the way up to the superintendent, that a reasonable jury could infer that he was the proximate cause of McCarthy's decision to suspend Watkins.

Pages: 90

Filed: 09/21/2020

Document: 17

Case: 20-1750

For these reasons, the disparate-treatment claim based on the 2014 suspension must also be dismissed.

## B. Retaliation

Watkins also brings a retaliation claim premised on the one-day suspension she received in 2014. According to Watkins, she was only suspended because she had accused Sergeant Higgins of filing a false CR against her based on discriminatory motives. Pl.'s Resp. Br. at 21.

In order to establish retaliation, Watkins must prove that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was motivated by the protected activity. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018). Ultimately, the plaintiff must show that her protected activity was the but-for cause of the adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Here, there is no real dispute that Watkins's October 2008 memorandum complaining of discrimination counts as protected activity for purposes of her retaliation claim. But the City argues that the 2014 one-day suspension was not an "adverse employment action," and even if it were, that there was no causal connection with Watkins's 2008 complaint. Def.'s Br. at 12-13. The materially adverse action argument is unconvincing. But the Court ultimately agrees with the City on the causation point.

### 1. Materially Adverse Action

For what it is worth, Watkins has sufficiently shown that the suspension, even though it was only for one day, constituted a materially adverse action for purposes

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

of her retaliation claim. The City maintains that the suspension was not a materially adverse action and cites the same reasons mentioned above—that is, that the suspension did not affect Watkins's promotion chances. But this time, the City's argument fails because the standard for what constitutes an adverse action for purposes of a retaliation claim is different from the standard for a disparate treatment claim. Specifically, a materially adverse action for retaliation purposes "need not be one that affects the terms and conditions of employment." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018). Rather, it just has to dissuade a reasonable employee from "engaging in the protected activity." *Id. See also Robertson v. Wis. Dep't. of Health Servs.*, 949 F.3d 371, 382 (7th Cir. 2020). Here, the City has provided no argument on how a one-day suspension (handed down by an employee's superiors) would *not* dissuade a reasonable employee from complaining about racial discrimination to those same superiors.

### 2. Causation

But Watkins cannot overcome the defense's causation argument. To be clear, Watkins has put forth enough evidence for a reasonable jury to infer that *Sergeant Kane* recommended the suspension due to retaliatory motives. But the problem is that Watkins has not offered similar evidence to explain why Rivera and McCarthy also recommended and implemented the suspension.

With regard to Kane, Watkins has provided just enough circumstantial evidence to permit a reasonable jury to infer a causal link between her 2008 memorandum and Kane's 2011 recommendation for suspension. It is true that there

Case: 20-1750      Document: 17      Filed: 09/21/2020      Pages: 90

was a three-year gap between the complaint and the recommendation. But the long passage of time between the protected activity and the adverse action is not dispositive, and "there are cases in which a plaintiff can demonstrate causation despite a substantial time lag." *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017) (cleaned up). *See also Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014) (retaliation charges may proceed in the face of long intervals when additional circumstances demonstrate that employer's acts may not be legitimate). And here, the length of the investigation actually cuts in favor of Watkins, because the City does not offer a good reason for Kane's year-and-a-half delay in conducting interviews of Watkins, White, and Higgins, or the year-and-a-half delay in putting together a summary report. To be clear, the length of the investigation itself is not an actionable basis for Watkins's retaliation claim. *See* R. 44, Order at 15-16. In other words, Watkins is not allowed to argue that the City retaliated against her by purposely prolonging the investigation (and therefore prolonging the stress of undergoing an investigation). But the length of the investigation by Kane can still serve as *evidence* that the ultimate suspension may have been driven by retaliatory motives.

In addition to the length of the investigation, Watkins has also provided evidence showing that Sergeant Kane harbored a retaliatory animus against her. According to Watkins, during one of her 2010 interviews with Kane, she accused Sergeant Higgins of being a racist. Watkins Dep. Tr. at 92:14-18. In response, Kane "was like you're defaming his reputation." *Id.* It is true that this exchange is not captured in the interview transcripts themselves, but given that those transcripts

Pages: 90     Filed: 09/21/2020     Document: 17     Case: 20-1750

were prepared by Kane herself, the Court concludes that Watkins has at least created a genuine dispute in material fact for purposes of the summary judgment stage. So, accepting as true Watkins's testimony that Kane was angry at her for "defaming" Higgins, then a reasonable jury could infer that Kane might have recommended suspension based on a desire to punish Watkins for making the discrimination allegation against Higgins. This inference of retaliatory motive is further strengthened by the fact that in Kane's October 2011 summary report of the investigation, she ultimately recommended a two-day suspension for Watkins, versus a one-day suspension for White, even though White was the one driving the patrol car on September 9, 2008, while Watkins was merely a passenger. *See* Investigation Records at DEF-WAT 000479. The only difference, according to Watkins, was that White "didn't speak up," whereas Watkins "had the audacity" to continue accusing Sergeant Higgins of racism. Watkins Dep. Tr. at 106:9-13. In that context, even though Watkins's suspension was eventually reduced from two days to one day, the fact that Kane initially recommended a disparate punishment supports an inference of retaliatory motive against Watkins.

But even if Kane acted with a retaliatory motive, Kane did not have the ultimate authority to unilaterally impose a suspension on Watkins. So, Watkins must also explain why Rivera and McCarthy decided to suspend her (or successfully invoke the cat's paw theory, as explained below). Here, the record shows that Sergeant's Kane's recommendations were reviewed by three other officers as part of the Command Review process, before going to IAD Chief Rivera and finally

Superintendent McCarthy, who was the ultimate decision-maker responsible for the suspension. DSOF ¶¶ 37-38. But unfortunately for Watkins, there is not enough evidence in the record to suggest that Rivera or McCarthy intended to retaliate against her.

Addressing McCarthy first, there is no dispute that he personally did not have a retaliatory motive against Watkins. Pl.'s Resp. DSOF ¶ 77. Rather, Watkins asserts a sort-of cat's-paw theory of liability against McCarthy. Cat's paw liability can "be imposed on an employer where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (cleaned up). Under this theory, "if a supervisor performs an act motivated by a discriminatory or retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Hicks v. Forest Preserve Dist.,* 677 F.3d 781, 790 (7th Cir. 2012) (cleaned up). A supervisor's discrimination may be the proximate cause of an employment decision "where the party nominally responsible for a decision is, by virtue of [his] role in the [department], totally dependent on another employee to supply the information on which to base that decision." *Brewer v. Bd. of Trs. of Univ. of Ill.,* 479 F.3d 908, 918 (7th Cir. 2007).

So, even if McCarthy himself did not have retaliatory motives, Watkins could still prevail if she shows that a biased supervisor (so, either Kane or Rivera or both) exerted influence over McCarthy's decision. *Rozskowiak v. Vill. of Arlington Heights,*

Pages: 90   Filed: 09/21/2020   Document: 17   Case: 20-1750

415 F.3d 608, 613 (7th Cir. 2005). In other words, there are two possible ways for cat's paw liability to work here. First, Watkins can try to show that Kane managed to exert influence over both Rivera and McCarthy, such that Kane's retaliatory motives were the proximate cause of both Rivera's recommendation to suspend Watkins as well as McCarthy's implementation of that suspension. Alternatively, Watkins can try to show that Rivera was also retaliatory, and that Rivera's retaliatory motives were the proximate cause of McCarthy's implementation of the suspension. Under either theory, the evidence does not hold up.

First, addressing the argument that Rivera himself harbored a retaliatory motive, Watkins does not offer any evidence that Rivera intended to retaliate against her based on her 2008 discrimination complaint against Higgins. Unlike with Kane, for example, Watkins does not identify any statements by Rivera showing that he was angry at her for "defaming" Higgins, or that he was offended by the fact that she complained about discrimination. Rather, Watkins's argument is that Rivera "didn't do nothing. He just looked at it, I'm going to protect Sergeant Higgins so he won't be disciplined and we're not going to defame his reputation. The nerve of this young girl to get a CR number against him. That's all he did." Watkins Dep. Tr. at 100:18-24. But Watkins did not personally observe Rivera's review process, nor is there any indication that he simply rubber-stamped Kane's recommendations without looking at anything else (other than Watkins's unsubstantiated belief). Watkins's only real piece of evidence in support of a retaliatory motive is the outcome, that is, the fact that Rivera chose to sustain the CR against her even after three other Command

Pages: 90    Filed: 09/21/2020    Document: 17    Case: 20-1750

Reviewers chose not to sustain the CR. According to Watkins, the outcome demonstrates that Rivera did not conduct his own investigation, because if he had conducted his own investigation, he would have chosen to not sustain the CR.

But that fact standing alone is not enough for a reasonable jury to infer retaliation on the part of Rivera. For one, there is no indication that Rivera's review was deficient; Watkins does not allege that he was required to conduct his own first-level review of the allegations in the CR (for instance, by conducting his own interviews). And here, Rivera averred that he reviewed the existing investigative file materials, including the CRs themselves, Kane's interview transcripts, the printout of the dispatch audio transcript, and the recommendations of Kane and the other CCR reviewers. Rivera Decl. ¶ 22. Although Watkins disputes that Rivera looked at anything in the investigative file, she does not offer any factual support for her position (other than the fact that he came to a conclusion she disagreed with), so the Court must accept as true that Rivera at least looked at the files in the investigative record. And for what it is worth, the "not sustained" findings of the three CCR reviewers are not so clear-cut in themselves—one of them is based on the reviewer's impression that the pause before the dispatcher asked Watkins and White to copy was not as long as Kane thought it was; the other was based on the reviewer's conclusion that as long as Watkins and White eventually showed up at the scene, they should not be found to have failed to respond in general; and the third was simply an adoption of the first finding without further explanation. So it was not entirely unreasonable for Rivera to come to a different conclusion.

Case: 20-1750　　　Document: 17　　　Filed: 09/21/2020　　　Pages: 90

Even if Rivera was careless in going through the file, or was too harsh in judging the events of the burglary call, or was even flat-out incorrect in concluding that Watkins should have responded at 11:35 p.m. instead of 11:36 p.m., all of those things standing alone do not permit a reasonable jury to infer a retaliatory motive. If Watkins could have pointed to some evidence that Rivera was personally angry about the fact that she complained about discrimination, or that he believed discrimination complaints were a waste of time or unmeritorious or something like that, for instance, then she might have a claim. But there is no such evidence to move the scale in the direction of retaliation. Instead, it is undisputed that Rivera "recommended sustaining hundreds of CR's based on inattention to duty against PO's of both genders and different races." DSOF ¶ 44.

There are two other facts that Watkins asserts against Rivera, but neither is convincing. First, Watkins argues that Rivera "submitted fictitious documents" to McCarthy. Watkins Dep. Tr. at 101:9-20. But when asked what those fictitious documents were, Watkins just responded documents alleging that she "didn't go to the job." *Id*. Without more evidence, this sounds like Rivera just submitted documents describing Higgins's allegations against Watkins that she failed to respond to the burglary call on time. Even though the facts of that night are intensely disputed, it would not have been "fictitious" for Rivera to submit either the original allegations or his findings sustaining the allegations to McCarthy. Watkins's argument might be actionable, for instance, if Rivera had falsified the findings of the other CCR reviewers by changing them from "not sustained" to "sustained," for instance, to trick

Case: 20-1750      Document: 17      Filed: 09/21/2020      Pages: 90

McCarthy into thinking that this was a clear-cut case when in fact different reviewers had come to different conclusions. But Watkins does not provide any such evidence. The other piece of evidence Watkins cites against Rivera is the fact that he sent a "thank you letter" to Higgins after the resolution of the CR against Watkins. Pl.'s Resp. Br. at 6. But it is undisputed that Rivera did not personally know Higgins (or Watkins), DSOF ¶ 43, and nothing in the letter suggests otherwise. R. 103-2, Pl.'s Resp. DSOF, Exh. 1 at 16. This does not look like a personal thank-you letter; rather, it appears to be a typical IAD form letter meant to document the close of a complaint.

So, absent evidence showing that Rivera had a retaliatory motive when he sustained the CR and recommended suspension, that just leaves the question of whether Sergeant Kane somehow managed to influence *both* Rivera's decision and McCarthy's decision. Unfortunately, even though Watkins has provided sufficient evidence that Kane might very well have harbored retaliatory feelings toward Watkins, she has failed to provide any evidence showing that Kane's motives actually worked their way up the chain of command to also influence Rivera and McCarthy. Thus, the retaliation claim must also be dismissed.

If it is any consolation to Watkins, her potential damages on the retaliation claim would have likely been very limited. To the extent that she is arguing that the 2014 one-day suspension hampered her chances at being promoted to detective, the Court agrees with the City that, based on the existing record, no reasonable jury could find a connection between the suspension and her applications for detective. Thus, her damages would have been limited to any emotional-distress damages that came

with receiving the suspension as well as the costs of challenging that suspension in arbitration.

## IV. Conclusion

For the reasons explained above, the City's motion for summary judgment is granted. Watkins's motion to file a sur-reply, R. 115, is denied. The status hearing of April 1, 2020 is vacated, and the Court will enter final judgment.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 26, 2020